**DX7**

**B E T W E E N**

Arva Investments Limited, an Ontario Corporation
Industria Capital Inc., a Saskatchewan Corporation
Ron Greschner Enterprises Inc., a Saskatchewan Corporation
Will Slobodian, Dwight G. Auramenko and Norm Reise, of
Regina, Saskatchewan
(The Shareholders of WaterGroup Companies Inc.)

- and -

1258010 Ontario Inc., an Ontario Corporation

- and -

UNITED STATES FILTER CORPORATION

SHARE PURCHASE AGREEMENT

DATED SEPTEMBER 30, 1997

**EXHIBIT 2**

Doc R249136

GRESCHNER 696

# TABLE OF CONTENTS

**ARTICLE I  DEFINITIONS; CONSTRUCTION** . . . . . . . . . . . . . . . . . 1
1.1   Definitions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
1.2   Construction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

**ARTICLE II  THE TRANSACTION** . . . . . . . . . . . . . . . . . . . . . . 8
2.1   Sale and Purchase of Company Shares . . . . . . . . . . . . . 8
2.2   Purchase Price . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
2.3   Closing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
2.4   Post-Closing Purchase Price Adjustment . . . . . . . . . . . 9
2.6   Closing Balance Sheets . . . . . . . . . . . . . . . . . . . . . . 9
                                                                   11

**ARTICLE III  REPRESENTATIONS AND WARRANTIES OF SELLERS** . . . . 12
3.1    Organization . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
3.2    Authorization; Enforceability . . . . . . . . . . . . . . . . . 12
3.3    Residence of Seller . . . . . . . . . . . . . . . . . . . . . . . 12
3.4    Company Shares; Capitalization . . . . . . . . . . . . . . . . 13
3.5    Subsidiaries and Investments . . . . . . . . . . . . . . . . . 13
3.6    Qualification . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
3.7    No Violation of Laws or Agreements; Consents . . . . . . . 13
3.8    Financial Information . . . . . . . . . . . . . . . . . . . . . . 13
3.9    Taxes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
3.10   Inventory . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
3.11   Receivables . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
3.12   Condition of Assets; Business; Title . . . . . . . . . . . . . 17
3.13   No Pending Litigation or Proceedings . . . . . . . . . . . . 17
3.14   Contracts; Compliance . . . . . . . . . . . . . . . . . . . . . 18
3.15   Permits; Compliance With Law . . . . . . . . . . . . . . . . 18
3.16   Real Property . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
3.17   Transactions With Related Parties . . . . . . . . . . . . . . . 19
3.18   Labour Relations . . . . . . . . . . . . . . . . . . . . . . . . . 19
3.19   Products Liability; Warranties . . . . . . . . . . . . . . . . . 20
3.20   Insurance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
3.21   Intellectual Property Rights . . . . . . . . . . . . . . . . . . 20
3.22   Canadian Employee Benefits . . . . . . . . . . . . . . . . . . 20
3.23   U.S. Employee Benefits . . . . . . . . . . . . . . . . . . . . . 21
3.24   Environmental Matters . . . . . . . . . . . . . . . . . . . . . . 22
3.25   Personal Property Leases . . . . . . . . . . . . . . . . . . . . 24
3.26   Customer Relations . . . . . . . . . . . . . . . . . . . . . . . 25
3.27   Investment Representation . . . . . . . . . . . . . . . . . . . 25
3.28   Finders' Fees . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
3.29   Pooling . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
3.30   Disclosure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
3.31   Prepayment Penalties . . . . . . . . . . . . . . . . . . . . . . 26
                                                                   26

- ii -

ARTICLE IV  REPRESENTATIONS AND WARRANTIES OF BUYER . . . . . 26
4.1    Organization . . . . . . . . . . . . . . . . . . . . . . 26
4.2    Authorization; Enforceability . . . . . . . . . . . . . . 26
4.3    No Violation of Laws; Consents . . . . . . . . . . . . . 26
4.4    No Pending Litigation or Proceedings . . . . . . . . . . 26
4.5    Capitalization . . . . . . . . . . . . . . . . . . . . . 27
4.6    Finders' Fees . . . . . . . . . . . . . . . . . . . . . . 27
                                                                 27

ARTICLE V  CERTAIN COVENANTS . . . . . . . . . . . . . . . . . .
5.1    Conduct of Business Pending Closing . . . . . . . . . . . 28
5.2    Access, Information and Documents . . . . . . . . . . . . 28
5.3    Certain Tax Matters . . . . . . . . . . . . . . . . . . . 29
5.4    Covenant Not to Compete . . . . . . . . . . . . . . . . . 29
5.5    Pooling . . . . . . . . . . . . . . . . . . . . . . . . . 30
5.6    Seller Letters . . . . . . . . . . . . . . . . . . . . . 30
5.7    Publicity . . . . . . . . . . . . . . . . . . . . . . . . 30
5.8    Fulfilment of Agreements . . . . . . . . . . . . . . . . 31
5.9    [Sale of USF Shares . . . . . . . . . . . . . . . . . . . 31
5.11   Assignment of Receivables . . . . . . . . . . . . . . . . 31
                                                                 31

ARTICLE VI  CONDITIONS TO CLOSING; TERMINATION . . . . . . . . .
6.1    Conditions Precedent to Obligation of Buyer . . . . . . . 31
6.2    Conditions Precedent to Obligation of Sellers . . . . . . 31
6.3    Deliveries at the Closing by Sellers . . . . . . . . . . 32
6.4    Deliveries at the Closing by Buyer . . . . . . . . . . . 33
6.5    Termination . . . . . . . . . . . . . . . . . . . . . . . 34
6.6    Investment Advisor . . . . . . . . . . . . . . . . . . . 35
                                                                 35

ARTICLE VII  SURVIVAL OF REPRESENTATIONS; INDEMNIFICATION . . . 35
7.1    Survival of Representations . . . . . . . . . . . . . . . 35
7.2    Indemnification by Sellers . . . . . . . . . . . . . . . 35
7.4    Indemnification by Buyer . . . . . . . . . . . . . . . . 35
7.6    Escrow . . . . . . . . . . . . . . . . . . . . . . . . . 37
7.7    Notice of Claims . . . . . . . . . . . . . . . . . . . . 37
7.8    Third Party Claims . . . . . . . . . . . . . . . . . . . 38
7.9    Good Faith Efforts to Settle Disputes . . . . . . . . . . 38
7.10   Payment . . . . . . . . . . . . . . . . . . . . . . . . . 39
7.11   Interest on Claims . . . . . . . . . . . . . . . . . . . 39
7.12   GST Gross-up . . . . . . . . . . . . . . . . . . . . . . 39
                                                                 40

ARTICLE VIII  MISCELLANEOUS . . . . . . . . . . . . . . . . . .
8.1    Costs and Expenses . . . . . . . . . . . . . . . . . . . 40
8.2    Further Assurances . . . . . . . . . . . . . . . . . . . 40
8.3    Notices . . . . . . . . . . . . . . . . . . . . . . . . . 40
8.4    Currency . . . . . . . . . . . . . . . . . . . . . . . . 40
                                                                 42

GRESCHNER 698

- iii -

| 8.5 | Assignment; Governing Law | . . . . . . . . . . . . . . . . . . . . . . . | 42 |
| 8.6 | Amendment and Waiver; Cumulative Effect | . . . . . . . . . . . . . . . . | 42 |
| 8.7 | Entire Agreement; No Third Party Beneficiaries | . . . . . . . . . . . . | 43 |
| 8.8 | Severability | . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 43 |
| 8.9 | Counterparts | . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 43 |
| 8.10 | Legal Fees | . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 43 |
| 8.11 | Retractable Share Documents | . . . . . . . . . . . . . . . . . . . . . | 43 |

## EXHIBITS

| Exhibit 1 | - | Retractable Share Provisions |
| Exhibit 2 | - | Voting Rights Agreement |
| Exhibit 3 | - | Support Agreement |
| Exhibit 4 | - | Share Exchange Agreement |
| Exhibit 5 | - | Escrow Agreement |
| Exhibit 6 | - | Seller Letter |

## SCHEDULES

| Schedule | 3.5 | Subsidiaries |
| Schedule | 3.7 | Consents |
| Schedule | 3.8 | Financial Statements |
| Schedule | 3.9 | Depreciable Property |
| Schedule | 3.12(b) | Encumbrances |
| Schedule | 3.13 | Litigation |
| Schedule | 3.14 | Contracts |
| Schedule | 3.16 | Real Property |
| Schedule | 3.17 | Related Parties |
| Schedule | 3.19 | Product Warranties |
| Schedule | 3.20 | Insurance Policies |
| Schedule | 3.21 | Intellectual Property |
| Schedule | 3.22 | Benefit Plans |
| Schedule | 3.23 | U.S. Benefit Plans |
| Schedule | 3.24(b) | Storage Tanks |
| Schedule | 3.25 | Personal Property |
| Schedule | 3.26 | Customer Relations |
| Schedule | 3.29 | Pooling |

Doc R249136

GRESCHNER 699

## SHARE PURCHASE AGREEMENT

This Agreement is made as of the 30th day of September, 1997

B E T W E E N :

**Arva Investments Limited, an Ontario Corporation
Industria Capital Inc., a Saskatchewan Corporation
Ron Greschner Enterprises Inc., a Saskatchewan Corporation
Will Slobodian, Dwight G. Auramenko and Norm Reise, of
Regina, Saskatchewan**
(individually referred to as "Seller" and collectively referred to as
"Sellers")

- and -

**1258010 Ontario Inc., an Ontario Corporation which is a Wholly-
Owned Subsidiary of USF**
(the "Buyer")

- and -

**United States Filter Corporation, a Delaware Corporation ("USF")**

Sellers are the registered holders of and desire to sell all of the issued and outstanding shares of WaterGroup Companies Inc. ("WCI"), consisting of 14,328 Class A common shares (the **"Company Shares"**) to Buyer, and Buyer desires to purchase the Company Shares, on the terms and subject to the conditions set forth below. In consideration of the representations, warranties, covenants and agreements contained herein, Sellers, Buyer and USF, each intending to be legally bound hereby, agree as set forth below.

## ARTICLE I
## DEFINITIONS; CONSTRUCTION

1.1        *Definitions*. As used in this Agreement, the following terms have the meanings specified in this Section 1.1. All accounting terms not specifically defined herein shall be construed in accordance with Accounting Principles.

**"Accounting Principles"** has the meaning given that term in Section 2.6(a).

- 2 -

**"Adjusted Bank Debt"** has the meaning given that term in <u>Section 2.4</u>.

**"Adjusted Closing Balance Sheet"** has the meaning given that term in <u>Section 2.6(a)</u>.

**"Affiliate"** means, with respect to any Person, any other Person that, directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with such Person.

**"Agreed USF Share Price"** is $49.81.

**"Agreement"** means this Share Purchase Agreement including the Exhibits and Schedules to this Agreement, as it may be amended or supplemented from time to time.

**"Bank Debt"** means amounts owing to third parties, including shareholder loans but not including accounts payable which are being paid in the ordinary course of business, deferred taxes or deferred revenue.

**"Business"** means the business of manufacturing, selling, servicing and financing water treatment products, pumps, tanks and filters currently conducted by the Company.

**"Buyer"** means 1258010 Ontario Inc., a corporation incorporated pursuant to the laws of Ontario and a wholly-owned subsidiary of USF.

**"Buyer Damages"** has the meaning given that term in <u>Section 7.2</u>.

**"Buyer Indemnitees"** has the meaning given that term in <u>Section 7.2</u>.

**"Canadian Benefit Plan"** has the meaning given that term in <u>Section 3.22(a)</u>.

**"CERCLIS"** means the United States Comprehensive Environmental Response Compensation Liability Information System List pursuant to Superfund.

**"Closing"** has the meaning given that term in <u>Section 2.3</u>.

**"Closing Balance Sheet"** has the meaning given that term in <u>Section 2.6(d)</u>.

**"Closing Date"** has the meaning given that term in <u>Section 2.3</u>.

**"Code"** means the United States Internal Revenue Code of 1986, as amended, and the applicable rulings and regulations thereunder.

**"Company"** means WaterGroup Companies Inc., a corporation incorporated pursuant to the *Canada Business Corporations Act* and each of its Wholly-Owned Subsidiaries and includes each of its predecessors, WG Capital Inc. and WaterGroup Companies Inc.

- 3 -

"**Company Plan**" has the meaning given that term in <u>Section 3.22(a)</u>.

"**Company Shares**" has the meaning given that term in the introductory paragraph of this Agreement.

"**Contract**" and "**Contracts**" have the respective meanings given those terms in <u>Section 3.13</u>.

"**Damages**" has the meaning given that term in <u>Section 7.7</u>.

"**Defined Benefit Plan**" has the meaning given that term in <u>Section 3.22(c)</u>.

"**Encumbrance**" means any liability, debt, mortgage, deed of trust, pledge, security interest, option, right of first refusal, agreement of sale, adverse claim, easement, lien, assessment, restrictive covenant, encroachment, burden or charge of any kind or nature whatsoever or any item similar or related to the foregoing other than a Permitted Encumbrance.

"**Environmental Law**" means any applicable Law relating to public health and safety or protection of the environment, including common law nuisance, property damage and similar common law theories.

"**ERISA**" means the United States *Employee Retirement Income Security Act* of 1974, as amended, and the applicable rulings and regulations thereunder.

"**Escrow**" has the meaning given that term in <u>Section 7.6(a)</u>.

"**Escrow Shares**" has the meaning given that term in <u>Section 7.6(a)</u>.

"**Final Closing Balance Sheet**" has the meaning given to that term in <u>Section 2.6(d)</u>.

"**Financial Statements**" has the meaning given that term in <u>Section 3.8(b)</u>.

"**GAAP**" means the Canadian generally accepted accounting principles as set out in The Handbook of the Canadian Institute of Chartered Accountants.

"**Governing Documents**" means, with respect to any Person who is not a natural Person, the certificate or articles of incorporation, bylaws, unanimous shareholder agreement, or governing agreement and other charter documents or organization or governing documents or instruments of such Person.

"**Governmental Body**" means any court, government (federal, state, provincial, local or foreign), department, commission, board, bureau, agency, official or other regulatory, administrative or governmental authority or instrumentality.

- 4 -

"**GST**" means the goods and services tax imposed under Part IX of the *Excise Tax Act* (Canada).

"**Indemnified Party**" has the meaning given that term in <u>Section 7.7</u>.

"**Indemnifying Party**" has the meaning given that term in <u>Section 7.7</u>.

"**Intellectual Property**" has the meaning given that term in <u>Section 3.21</u>.

"**IRS**" means the United States Internal Revenue Service.

"**ITA**" means the *Income Tax Act of Canada*, as amended, and the regulations thereunder.

"**Law**" means any applicable federal, state, provincial, municipal, local or foreign statute, law, ordinance, rule, regulation, judgment or order of any kind or nature including any written policy, rule or order of any Governmental Body or principle of common law.

"**Litigation**" has the meaning given that term in <u>Section 3.13</u>.

"**NYSE**" means the New York Stock Exchange.

"**Other Agreement**" means each other agreement or document contemplated hereby to be executed and delivered in connection with the transactions contemplated by this Agreement on or before Closing.

"**PBGC**" means the United States Pension Benefit Guaranty Corporation.

"**PCBs**" means polychlorinated biphenyls.

"**Permit**" and "**Permits**" have the respective meanings given those terms in <u>Section 3.15</u>.

"**Permitted Encumbrance**" applies only to Real Property and means:

a)     liens for taxes, assessments and governmental charges due and being contested in good faith and diligently by appropriate proceedings;

b)     liens for taxes either not due and payable or due but for which notice of assessment has not been given;

c)     undetermined or inchoate liens, charges and privileges incidental to current construction or current operations and statutory liens, charges, adverse claims, security interests or encumbrances of any nature whatsoever claimed or held by any governmental authority, or arising under any applicable laws or regulations,

GRESCHNER 703

- 5 -

that have not at the time been filed or registered against the title to the asset or served upon the Company or the Sellers pursuant to law or that relate to obligations not due or delinquent;

d)    assignments of insurance provided to landlords (or their mortgagees) pursuant to the terms of any lease, and liens or rights reserved in any lease for rent or for compliance with the terms of such lease;

e)    prepayments or deposits given in the ordinary course of the Business to any public utility, municipality or government or to any statutory or public authority in connection with the operations of the Business, other than security for borrowed money;

f)    the reservations, limitations, provisos and conditions in any original grant from the Crown of any Real Property in Canada or interest therein and statutory exceptions to title;

g)    rights reserved to or vested in any governmental authority by the terms of any lease, licence, grant, or by any statutory provision;

h)    good faith deposits made in the ordinary course of business to secure the performance of bids, tenders, contracts (other than for the repayment of borrowed money), leases, surety, customs and performance bonds and other similar obligations;

i)    any mechanics', builders', warehousemen's, carriers' or other similar liens arising in the ordinary course of the Business and out of the construction or improvement of the Real Property or out of the furnishings of materials or supplies therefor to the extent that such lien relates to obligations which are not overdue or, if overdue, are being diligently contested in good faith;

j)    zoning and building by-laws and ordinances, municipal by-laws and regulations or other similar restrictions, provided that the same are not of such nature as to adversely affect the current use of the property subject thereto;

k)    rights reserved to or vested in any municipality or governmental, statutory or public authority to control or regulate any of the assets of the Company in any manner, and all rights reserved pursuant to applicable laws, rules and orders of any governmental authority; and

l)    the Encumbrances described in Schedule 3.12.

**"Person"** means and includes a natural person, a corporation, an association, a partnership, a limited liability company, a trust, a joint venture, an unincorporated organization, a business, any other legal entity, and a Governmental Body.

- 6 -

**"Personal Property Lease"** has the meaning given that term in Section 3.24.

**"Post-Closing Purchase Price Adjustment"** means the post-closing adjustment to the Purchase Price pursuant to Section 2.4.

**"Preliminary Closing Balance Sheet"** has the meaning given that term in Section 2.6(a).

**"Prime Rate"** means the prime rate of interest per annum quoted by Canadian Imperial Bank of Commerce ("CIBC") from time to time as its reference rate of interest for Canadian dollar demand loans made to its commercial customers in Canada and which CIBC refers to as its "prime rate", as such rate may be changed from time to time.

**"Purchase Price"** has the meaning given that term in Section 2.2.

**"Real Property"** has the meaning given that term in Section 3.16.

**"Receivables"** has the meaning given that term in Section 3.11.

**"Regulated Material"** means any substance that because of its quantity, concentration or physical, chemical or infectious characteristics, either individually or in combination with other substances, is an existing or a potential threat to the environment, human health or other living organisms or as otherwise defined to be hazardous under any applicable Environmental Law and without limiting the generality of the foregoing shall include any substance whether liquid, solid or gas which is from time to time listed, defined, designated or classified as hazardous, toxic, radioactive or dangerous, or as a pollutant or waste, under any applicable Environmental Laws, whether by quality, type or quantity and includes petroleum, petroleum-related material, crude oil or any fraction thereof, PCB's and friable asbestos.

**"Related Party"** means (i) Sellers, (ii) any Affiliate of Sellers, (iii) any officer or director of any Person identified in clauses (i) or (ii) preceding, and (iv) any spouse, sibling, ancestor or lineal descendant of any natural Person identified in any one of the preceding clauses.

**"Retractable Shares"** shall mean shares of Buyer having share conditions substantially as set out in Exhibit 1, as may be amended as agreed by Industria Capital Inc. and USF.

**"Rule 145 Legend"** means a legend which reads:

> "The shares represented by this certificate were issued in a transaction to which Rule 145 promulgated under the U.S. Securities Act of 1933 applies. The shares represented by this certificate may only be transferred in accordance with the terms of an agreement dated as of September 30, 1997, between the

- 7 -

registered holder hereof and the Company, a copy of which agreement is on file at the principal offices of the Company."

**"SEC"** means the United States Securities and Exchange Commission.

**"Securities Act"** means the United States *Securities Act* of 1933, as amended.

**"Security Right"** means, with respect to any security, any option, warrant, subscription right, preemptive right, other right, proxy, put, call, demand, plan, commitment, agreement, understanding or arrangement of any kind relating to such security, whether issued or unissued, or any other security convertible into or exchangeable for any such security. **"Security Right"** includes any right relating to issuance, sale, assignment, transfer, purchase, redemption, conversion, exchange, registration or voting of any security and includes rights conferred by statute, by the issuer's Governing Documents or by agreement.

**"Seller Damages"** has the meaning given that term in Section 7.4.

**"Seller Indemnitees"** has the meaning given that term in Section 7.4.

**"Senior Officers"** means Don Fettes, Joe Morrison, Norm Reise, Dwight Auramenko, Ron Karasin, Jim Tidd, Wayne Bosch, Al Matt and Dale Lewgood.

**"Shareholders' Equity of the Company"** has the meaning given that term in Section 2.4.

**"Shelf Registration Statement"** means the registration statement on Form S-4 (No. 333-35189) of USF, which became effective on September 15, 1997.

**"Subsidiary"** means any corporation, partnership, joint venture or other entity in which the Company owns, directly or indirectly, more than 20% of the outstanding voting securities or equity interests.

**"Superfund"** means the *United States Comprehensive Environmental Response Compensation and Liability Act* of 1980, 42 U.S.C. Sections 6901 *et seq.*, as amended.

**"Taxes"** means all taxes, charges, fees, levies, imposts and other assessments, including all income, sales, use, goods and services, value added, capital, capital gains, alternative, net worth, transfer, profits, withholding, payroll, employer health, excise, real property and personal property taxes, and any other taxes, customs duties, fees, assessments or similar charges in the nature of a tax including employer pension plan contributions, unemployment insurance payments and workers compensation premiums where required by statute, together with any instalments with respect thereto, and any interest, fines and penalties, imposed by any governmental authority (including federal, state, provincial, municipal and foreign governmental authorities), and whether disputed or not.

- 8 -

**"Tax Return"** means any return, declaration, remittances, report, claim for refund, or information return or statement relating to any Tax, including any schedule or attachment thereto, and including any amendment thereof.

**"U.S. Benefit Plan"** has the meaning given that term in <u>Section 3.23(a)</u>.

**"U.S. Company Plan"** has the meaning given that term in <u>Section 3.23(a)</u>.

**"USF"** means United States Filter Corporation, a Delaware corporation.

**"USF Common Stock"** and **"USF Shares"** means common stock of USF par value US$0.01 per share.

**"Wholly-Owned Subsidiaries"** means Aqua Fine Water Inc., a corporation incorporated under the laws of the Province of Saskatchewan, Aquafinance Inc., a company incorporated under the *Canada Business Corporations Act,* Watergroup Inc., and Water Systems Inc., both corporations incorporated under the laws of the State of Nebraska , Trupar Inc., a corporation incorporated under the laws of the State of Ohio and Watergroup Inc., a corporation incorporated under the *Canada Business Corporations Act.*

**"Working Capital"** has the meaning given that term in <u>Section 2.4</u>.

1.2    <u>Construction</u>.  As used herein, unless the context otherwise requires:    (i) references to "Article" or "Section" are to an article or section hereof; (ii) all "Exhibits" and "Schedules" referred to herein are to Exhibits and Schedules attached hereto and are incorporated herein by reference and made a part hereof; (iii) "include", "includes" and "including" are deemed to be followed by "without limitation" whether or not they are in fact followed by such words or words of like import; and (iv) the headings of the various articles, sections and other subdivisions hereof are for convenience of reference only and shall not modify, define or limit any of the terms or provisions hereof.

## ARTICLE II
## THE TRANSACTION

2.1    <u>Sale and Purchase of Company Shares</u>.  Upon the terms and subject to the conditions of this Agreement and in consideration of the Purchase Price, Sellers shall sell, assign, transfer and deliver the Company Shares to Buyer, and Buyer shall purchase from Sellers and take delivery of the Company Shares, at the Closing, free of all Encumbrances.

2.2    <u>Purchase Price</u>.  The aggregate purchase price for the Company Shares shall be $25,000,000 less the amount paid by WCI to purchase or redeem the Class A Common Shares and the preferred shares owned by SasInvest Capital Corporation which redemption and

- 9 -

repurchase will take place on the Closing Date and will cost $1,126,990, (the **"Purchase Price"**) as the Purchase Price may be decreased by the Post-Closing Purchase Price Adjustment, if any.

2.3    **Closing.**  The consummation of the purchase and sale of the Company Shares and the other transactions contemplated hereby (the **"Closing"**) shall take place on September 30, 1997 at the offices of MacPherson Leslie & Tyerman in Regina, Saskatchewan, or at such other date or place as the parties agree (the **"Closing Date"**).  Immediately prior to Closing, the shares owned by SasInvest Capital Corporation will be redeemed, and WCI will be amalgamated with its Shareholder WG Capital Inc. and continue as WCI.  Also at Closing the shareholder loan advanced by Ron Greschner will be purchased by Buyer as set out in Section 2.5.

2.4    **Post-Closing Purchase Price Adjustment**.  If the Shareholders' Equity of the Company at the close of business on the Closing Date is less than Cdn.$4,426,977, then the Purchase Price shall be reduced, dollar-for-dollar, by the amount of such deficiency. **"Shareholders' Equity of the Company"** means the excess of the consolidated assets of the Company over the consolidated liabilities of the Company, as adjusted and calculated in accordance with the procedure established for determining the Final Closing Balance Sheet in Section 2.6.  In addition, if the consolidated Bank Debt of the Company immediately prior to Closing (including the amount of the Ron Greschner loan in the amount of $1,194,490) but excluding any amount borrowed to redeem or purchase WCI shares owned by SasInvest Capital Corporation or caused by the funding of up to 75% of the face value of conditional sales contracts receivable arising between June 30, 1997 and the Closing (the "Adjusted Bank Debt"), exceeds $41,000,000 then the Purchase Price shall be reduced dollar for dollar by the amount of the Adjusted Bank Debt in excess of $41,000,000.  In addition, if the Adjusted Bank Debt exceeds $40,500,000 the Purchase Price shall be reduced dollar for dollar to the extent that the lesser of $41,000,000 or the Adjusted Bank Debt is greater than the aggregate of $40,500,000 and any increase in Working Capital between June 30, 1997 and Closing, where Working Capital means the aggregate value of inventory, accounts receivable and prepaid expenses less accounts payable.

2.5    **Payment**

(a)    **Payment**.  Upon the terms and subject to the conditions of this Agreement, subject to the holding of shares in escrow pursuant to Section 7.6:

(1)    Buyer shall deliver or cause to be delivered at Closing to each of Will Slobodian, Dwight G. Auramenko and Norm Reise, 18,821 USF Shares registered in their names and subject to a Rule 145 Legend provided that 1882 of the said shares shall, in the case of each Seller, be represented by a separate certificate which the Seller will endorse in blank and deliver to the Buyer's counsel to be held pursuant to the Escrow described in Section 7.6, against delivery to Buyer by each of the said Sellers of duly endorsed certificates representing all their shares in WCI.

- 10 -

(2)    Buyer shall deliver or cause to be delivered at Closing to Ron Greschner 23,981 USF Shares against delivery by Ron Greschner of a release or assignment, in such form as Buyer may require of the shareholder loan owed to Ron Greschner by WCI in the amount of $1,194,490.

(3)    USF shall deliver or cause to be delivered at Closing to Arva Investments Limited  215,692 USF Shares registered in its name and subject to a Rule 145 Legend provided that 21,569 of the said shares shall be represented by a separate certificate which the Seller will endorse in blank and deliver to the Buyer's counsel to be held pursuant to the Escrow described in Section 7.6, against delivery to USF of duly executed share certificates representing all the Company Shares of such Seller in WCI.

(4)    Buyer shall deliver or cause to be delivered to Industria Capital Inc. within seven (7) days after Closing 90,655 USF Shares registered in its name and subject to a Rule 145 Legend.

(5)    If an order of the Saskatchewan Securities Commission satisfactory to USF is obtained before October 31, 1997 providing that USF will not be required to become a reporting issuer or file any material with the Commission as a result of the transactions contemplated by this Agreement, then on the day after such order is obtained, Buyer shall deliver or cause to be delivered to Industria Capital Inc., 60,437 Retractable Shares of Buyer registered in the name of Industria Capital Inc. provided that 15,109 of the said shares shall be represented by a separate certificate which the Seller will endorse in blank and deliver to Buyer's counsel to be held pursuant to the Escrow described in Section 7.6.  If no such order is obtained then Buyer shall deliver or cause to be delivered to Industria Capital Inc. on October 31, 1997 60,437 USF Shares registered in its name and subject to a Rule 145 Legend, provided that 15,109 of the said shares shall be represented by a separate certificate which the Seller will endorse in blank and deliver to the Buyer's counsel to be held pursuant to the Escrow described in Section 7.6. Delivery of duly endorsed share certificates representing all its shares in WCI will be made at Closing to Buyer by Industria Capital Inc.

(6)    Buyer shall deliver or cause to be delivered to Ron Greschner Enterprises Inc., within seven days after Closing 56,040 USF Shares registered in its name and subject to a Rule 145 Legend, provided that 5,604 of the said shares shall be represented by a separate certificate which the Seller will endorse in blank and deliver to the Buyer's counsel to be held pursuant to the Escrow described in Section 7.6.  Delivery of duly endorsed share certificates representing all the shares of such Seller in WCI will be made to Buyer at Closing by Ron Greschner Enterprises Inc.

(b)    Section 85 Elections.  The Buyer agrees that it will elect with each of the Sellers that acquires Retractable Shares of the Buyer, pursuant to section 85 of the *Income Tax*

GRESCHNER 709

*Act* (Canada) and any equivalent provisions of all relevant provincial legislation. Provided that a Seller who wishes to make such an election must prepare and complete such elections in prescribed form and deliver the same to the Buyer no later than November 30, 1997. Provided that the Buyer received such elections no later than November 30, 1997, it will execute all such elections within 10 days of receipt thereof and will cause the executed elections to be delivered to the relevant Seller. Each Seller preparing an election shall be responsible for the elections complying with the provisions of the relevant taxing legislation, the filing of such elections and all costs arising in connection with the preparation and filing of such elections and the Buyer shall have no liability in that regard. Each Seller which files any such elections shall provide the Buyer with a copy of each such election as filed.

      (c)    All USF Shares and Retractable Shares delivered hereunder will be free of all Encumbrances other than hold periods required under securities legislation.

**2.6**       **Closing Balance Sheets.**

      (a)    **Preliminary and Adjusted Closing Balance Sheets.** Promptly after the Closing, Sellers shall prepare a consolidated balance sheet and related notes of the Company as of the close of business on the Closing Date (the **"Preliminary Closing Balance Sheet"**). The Preliminary Closing Balance Sheet shall be prepared in accordance with the Accounting Principles. As used herein, **"Accounting Principles"** mean GAAP applied on a basis consistent with past practices except that no item shall fail to be included therein or excluded therefrom on the basis of materiality, individually or collectively. The parties shall conduct a physical count of the inventory of the Company on October 1, 1997. Buyer shall examine and review the Preliminary Closing Balance Sheet in accordance with generally accepted auditing standards and, based upon such examination, make such adjustments, other than to warranty reserves and inventory reserves, if any, to the Preliminary Closing Balance Sheet as shall in its judgment be required to cause the Preliminary Closing Balance Sheet to reflect fairly those items required to be reflected therein in accordance with the Accounting Principles (after examination and any adjustment, the **"Adjusted Closing Balance Sheet"**).

      (b)    **Delivery of Adjusted Closing Balance Sheet.** On or before 45 days after Sellers have delivered to Buyer the Preliminary Closing Balance Sheet, the Adjusted Closing Balance Sheet shall be delivered by Buyer to Sellers. Sellers and their representatives shall be provided complete access to all work papers and other information used by Buyer in preparing the Adjusted Closing Balance Sheet. The Adjusted Closing Balance Sheet, when delivered by Buyer to Sellers, shall be deemed conclusive and binding on the parties for purposes of determining the Post-Closing Purchase Price Adjustment, unless Sellers notify Buyer in writing within twenty (20) days after receipt of the Adjusted Closing Balance Sheet of their disagreement therewith, which notice shall state with reasonable specificity the reasons for any disagreement and identify the items and amounts in dispute.

      (c)    **Arbitration.** If any disagreement concerning the Post-Closing Purchase Price Adjustment is not resolved by Buyer and Sellers within sixty-five (65) days following the

- 12 -

receipt by Sellers of the Adjusted Closing Balance Sheet, the undisputed amount shall be paid in accordance with Section 2.5, and Buyer and Sellers shall promptly engage, on standard terms and conditions for a matter of such nature, a nationally recognized firm of independent accountants to resolve such dispute. The firm of independent accountants shall be proposed in writing by Buyer to Sellers. In the absence of prompt agreement on the identity of the independent accountants, the Regina or Saskatoon Office of the accounting firm of Coopers & Lybrand shall be engaged by the parties. The engagement agreement with the independent accountants shall require the independent accountants to make their determination with respect to the items in dispute within ninety (90) days following the receipt by Sellers of the Adjusted Closing Balance Sheet. Buyer and Sellers shall each pay one-half of the cost of the fees and expenses of such independent accountants at the time of payment of the Post-Closing Purchase Price Adjustment. The resolution by the independent accountants of any dispute concerning the Post-Closing Purchase Price Adjustment shall be final, binding and conclusive upon the parties and shall be the parties' sole and exclusive remedy regarding any dispute concerning the Post-Closing Purchase Price Adjustment.

    **(d)**    **Final Closing Balance Sheet**. The Adjusted Closing Balance Sheet, as modified by the parties' agreement and by any determination by the independent accountants as described in this Section 2.6, shall be the **"Final Closing Balance Sheet"**.

**2.7**    **Sellers' Access**. After Closing, Buyer shall cause the Company to allow the Sellers and their representatives reasonable access during normal business hours to the books and records of the Company for the purpose of preparing, or supporting their preparation of the Preliminary Closing Balance Sheet.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF SELLERS

As an inducement to Buyer and USF to enter into this Agreement and consummate the transactions contemplated hereby, each of Sellers, save as otherwise provided herein represents and warrants to Buyer and USF as follows:

**3.1**    **Organization**. WCI is a corporation duly organized, and validly existing under the laws of its jurisdiction of organization, and has the corporate power and authority to own or lease its properties, carry on its business as now conducted, enter into this Agreement and the Other Agreements to which it is or is to become a party and perform its obligations hereunder and thereunder. WCI owns directly or indirectly all the issued shares of the Wholly-Owned Subsidiaries, each of which is a corporation duly organized and validly existing under the laws of its jurisdiction of organization and has the corporate power and authority to own or lease its properties and carry on its business as now conducted.

**3.2**    **Authorization; Enforceability**. This Agreement and each Other Agreement to which Sellers , or any of them, is a party have been duly executed and delivered by and constitute the legal, valid and binding obligations of such party, enforceable against it in accordance with their respective terms. Each Other Agreement to which Sellers, or any of

- 13 -

them, is to become a party pursuant to the provisions hereof, when executed and delivered by such party, will constitute the legal, valid and binding obligation of such party, enforceable against such party in accordance with the terms of such Other Agreement. All actions contemplated by this Section and this Agreement have been duly and validly authorized by all necessary proceedings by Sellers. Each Seller represents that he or it is not an insolvent person within the meaning of the *Bankruptcy and Insolvency Act* (Canada) nor will become an insolvent person as a result of the Closing. Provided that the representations and warranties in this section with respect to Agreements or Other Agreements are only made by any Seller which is a party to such Agreement and then only to the extent of such party.

3.3        <u>Residence of Seller</u>. Each Seller represents that it is not a non-resident of Canada for purposes of Section 116 of the ITA.

3.4        <u>Company Shares; Capitalization</u>. The authorized capital of WCI consists solely of an unlimited number of common shares, of which, at Closing, only 14,328 common shares will be issued and outstanding. The Company Shares constitute all of the issued and outstanding shares of WCI. All of the Company Shares are owned of record by the Sellers. All of the Company Shares are validly issued, fully paid and non-assessable. Each Seller, with respect to its or his shares of record, represents that such shares are legally and beneficially owned by such Seller, the shares are free and clear of any and all Encumbrances, other than restrictions on the right to transfer as set out in the Governing Documents of WCI, and upon delivery hereunder, Buyer will acquire title thereto, free and clear of any and all Encumbrances. There are no Security Rights relating to any of the unissued shares of WCI and all rights and powers to vote the shares owned by each Seller are held exclusively by such Seller.

3.5        <u>Subsidiaries and Investments</u>. WCI does not own directly or indirectly, nor has it owned since 1987, any shares of or other equity interest in any corporation, partnership, joint venture or other entity, other than the Wholly-Owned Subsidiaries except as set forth in Schedule 3.5.

3.6        <u>Qualification</u>. The Company is duly qualified and is duly authorized to transact business in each jurisdiction wherein the character of the properties owned or leased by it or the nature of the activities conducted by it makes such qualification or authorization necessary except where such failure to qualify has no material adverse effect on the business or condition of the Company or its properties.

3.7        <u>No Violation of Laws or Agreements; Consents</u>. Subject to the matters identified in Schedule 3.7 hereto, neither the execution and delivery of this Agreement or any Other Agreement to which Sellers or the Company, or any of them, is or is to become a party, the consummation of the transactions contemplated hereby or thereby nor the compliance with or fulfilment of the terms, conditions or provisions hereof or thereof by Sellers, or any of them, will:  (i) contravene any provision of the Governing Documents of the Company, (ii) conflict with, result in a breach of, constitute a default or an event of default (or an event that might, with the passage of time or the giving of notice or any of them, constitute a default or event of default) under any of the terms of, result in the termination of, result in the loss of any right

- 14 -

under, or give to any other Person the right to cause such a termination of or loss under, any asset of the Company, including any Permit, Intellectual Property, license, franchise, indenture, mortgage or any other contract, agreement or instrument to which the Company is a party or by which any of its assets may be bound or affected, (iii) result in the creation, maturation or acceleration of any liability or obligation of the Company (or give to any other Person the right to cause such a creation, maturation or acceleration), (iv) violate any Law or violate any judgment or order of any Governmental Body to which the Company is subject or by which any of its assets may be bound or affected, or (v) result in the creation or imposition of any Encumbrance upon any of the Company Shares or give to any other Person any interest or right therein.   Except as listed in Schedule 3.7, no consent, approval or authorization of, or registration or filing with, any Person is required in connection with the execution or delivery by Sellers, or any of them, of this Agreement or any of the Other Agreements to which any of them, is or is to become a party pursuant to the provisions hereof or the consummation by Sellers or the Company, or any of them, of the transactions contemplated hereby or thereby, or to permit the Company to carry on the Business after the Closing as the Business is currently carried on by the Company.

**3.8**          **Financial Information.**

(a)     <u>Records.</u>  The books of account and related records of the Company have been maintained in accordance with GAAP and reflect accurately its assets, liabilities, revenues and expenses.

(b)     <u>Financial Statements.</u>   Attached as <u>Schedule 3.8</u> are the audited consolidated and unaudited consolidating balance sheets, income statements and statements of cash flows for the Company at December 31, 1996 and December 31, 1995 and for the years then ended, and attached hereto as <u>Schedule 3.8</u> are the unaudited consolidated and consolidating balance sheets, income statements and, for WCI only a statement of cash flow, for the Company at August 31, 1997 and for the periods then ended (collectively, the **"Financial Statements"**). The Financial Statements (i) are accurate, correct and complete in accordance with the books of account and records of the Company, (ii) except for the fact that subsidiaries of WCI which in turn have subsidiaries do not have consolidated statements, have been prepared in accordance with the Accounting Principles on a consistent basis throughout the indicated periods, and (iii) present fairly the financial condition, assets and liabilities and results of operation of the specified corporations at the dates and for the relevant periods indicated, in accordance with the Accounting Principles.

(c)     <u>Undisclosed Liabilities.</u>  The Company has no debt, obligation or liability, absolute, fixed, contingent or otherwise, of any nature whatsoever, whether due or to become due, including to the best knowledge of the Senior Officers any unasserted claim, whether incurred directly or by any predecessor thereto, and whether arising out of any act, omission, transaction, circumstance, sale of goods or services, state of facts or other condition, except: (i) those reflected or reserved against on the Financial Statements in the amounts shown therein; (ii) those not required under Accounting Principles to be reflected or reserved against in the Financial Statements; (iii) those disclosed on <u>Schedules 3.8 and 3.13</u> attached hereto; and (iv)

- 15 -

those of the same nature as those set forth on the Financial Statements that have arisen in the ordinary course of business of the Company after the date of the latest Financial Statements through the date hereof, all of which have been consistent in amount and character with past practice and experience, and none of which, individually or in the aggregate, has had or will have an adverse effect on the business, financial condition or prospects of the Company and to the best knowledge of the Senior Officers none of which is a liability for breach of contract or warranty or has arisen out of tort, infringement of any intellectual property rights, or violation of law or is claimed in any pending or threatened legal proceeding.

(d)    **No Changes.**  Since the date of the Financial Statements, to the Closing Date, the Company has conducted its business only in the ordinary course. Without limiting the generality of the foregoing sentence, except as set out in Schedule 3.8 since the date of the Financial Statements, there has not been any: (i) material adverse change in the financial condition, assets, liabilities, business or prospects of the Company; (ii) damage or destruction to any asset of the Company, whether or not covered by insurance the cost to repair or replace which exceeds $10,000; (iii) strike or other labour trouble at the Company; (iv) creation of any Encumbrance on any asset of the Company except as set out in Schedule 3.8; (v) declaration or payment of any dividend or other distribution, on or with respect to or redemption or purchase by the Company of any shares of the Company, including any of the Company Shares; (vi) except as set out, increase in the salary, wage or bonus of any managerial employee of the Company except those done in the normal course of business for periodic raises in accordance with past business practices, or any increase in the number of such employees; (vii) individual asset acquisitions or expenditures in excess of $10,000, other than the purchase of inventory in the ordinary course of business; (viii) change in any Company Plan or U.S. Company Plan; (ix) change in any method of accounting; (x) payment to or transaction with any Related Party, which payment or transaction is not specifically disclosed on Schedule 3.17; (xi) disposition of any asset (other than inventory in the ordinary course of business) for less than fair market value; (xii) payment, prepayment or discharge of any liability other than in the ordinary course of business or any failure to pay any liability when due; (xiii) except in accordance with GAAP, write-offs or write-downs of any assets of the Company; (xiv) except as set out in Schedule 3.8 creation, termination or amendment of, or waiver of any right under, any material agreement of the Company; or (xv) agreement or commitment to do any of the foregoing.

3.9       **Taxes.**

(a)    **Tax Returns.**  The Company has prepared and filed on time with all appropriate governmental bodies all Tax returns, declarations, remittances, information returns, reports and other documents of every nature required to be filed by or on behalf of the Company in respect of any Taxes or in respect of any other provision in any domestic or foreign federal, provincial, municipal, state, territorial or other taxing statute for all fiscal periods ending on or prior to the Closing Date. All such returns, declarations, remittances, information returns, reports and other documents are correct and complete in all material respects, and no material fact has been omitted therefrom. No extension of time in which to file any such returns, declarations, remittances, information returns, reports or other documents is in effect. All Taxes shown on all such returns, or on any assessments or reassessments in respect of any such returns

GRESCHNER 714

- 16 -

have been paid in full. No claim has been made by any authority of a jurisdiction where the Company does not file tax returns that they are or may be subject to taxation in that jurisdiction.

(b)    **Payments**. The Company has paid in full all Taxes required to be paid by it on or prior to the date hereof and has made adequate provision in the Financial Statements in accordance with generally accepted accounting principles for the payment of all its Taxes in respect of all fiscal periods ending on or before the Closing Date.

(c)    **Reassessments**. There are no reassessments of the Company's Taxes that have been issued and are outstanding and there are no outstanding issues which have been raised and communicated to the Company by any governmental body for any taxation year in respect of which a Tax return of the Company has been audited. No governmental body has challenged, disputed or questioned the Company in respect of its Taxes or of any returns, filings or other reports filed under any statute providing for Taxes. The Company is not negotiating any draft assessment or reassessment with any governmental body. The Sellers are not aware of any contingent Tax liabilities or any grounds for an assessment or reassessment of the Company, including, without limitation, unreported benefits conferred on any shareholder of the Company, aggressive treatment of income, expenses, credits or other claims for deduction under any return or notice other than as disclosed in the Financial Statements. Neither the Company nor the Sellers have received any indication from any governmental body that an assessment or reassessment of the Company is proposed in respect of any Taxes, regardless of its merits. The Company has not executed or filed with any governmental body any agreement or waiver extending the period for assessment, reassessment or collection of any Taxes. All taxation years up to and including the taxation year ended December 31, 1993 are considered closed by Canadian federal and provincial governmental bodies for the purposes of all Taxes that may be owed by the Company.

(d)    **Witholding and Remittances**. The Company has withheld from each payment made to any of its present or former employees, officers and directors, and to all persons who are non-residents of Canada for the purposes of the ITA, all amounts required by law to be withheld, and furthermore, has remitted such withheld amounts within the prescribed periods to the appropriate governmental body. The Company has remitted all Canada Pension Plan contributions, provincial pension plan contributions, unemployment insurance premiums, employer health taxes and other Taxes payable by it in respect of its employees and has remitted such amounts to the proper governmental body within the time required under the applicable legislation. The Company has charged, collected and remitted on a timely basis all Taxes as required under applicable legislation on any sale, supply or delivery whatsoever, made by the Company.

(e)    **Depreciable Property**. At the Closing Date, for purposes of the ITA, the Company will own depreciable property of the prescribed classes and having undepreciated capital costs as at December 31, 1996 as set out in Schedule 3.9.

**(f)** <u>Deductible Expenses</u>.  The Company has not in any of its last four taxation years beginning before the date hereof, incurred any outlay or expense that was deductible by the Company in computing income under the ITA, in respect of which any material amount was owing by the Company to a person with whom the Company was not dealing at arm's length at the time the outlay or expense was incurred, and which remains unpaid at the date hereof.

**(g)**  The Company has not acquired an asset from a person with whom it did not deal at arm's length for purposes of the ITA or for purposes of any relevant provincial income tax legislation for consideration greater than the fair market value of such asset at the time of its acquisition by the Company.

**(h)**  None of the transactions referred to in Section 2.3 will result in any liability for Taxes to the Company nor will they result in the application of section 80 of the ITA to the Company.

**3.10**    <u>Inventory</u>.  All of the inventory owned by the Company is valued on the books and records of the Company and in the Financial Statements at lower of cost or net realizable value, the cost thereof being determined on a FIFO basis in accordance with Accounting Principles.  All of the finished goods inventory of the Company is in good, merchantable and usable condition and, except to the extent reserved for in the Financial Statements, is saleable in the ordinary course of business as now conducted within a reasonable time and at normal profit margins, and all of the raw materials and work-in-process inventory of the Company can reasonably be expected to be consumed in the ordinary course of business within a reasonable period of time.  Except as reflected on the Financial Statements, none of the Company's inventory is obsolete, has been consigned to others or is on consignment from others.

**3.11**    <u>Receivables</u>.  A comprehensive list delivered to the Buyer on September 29, prior to the Closing hereto, discloses all trade and other accounts receivable of the Company ("**Receivables**") outstanding as of September 28  presented on an aged basis and separately identifies the name of each account debtor and the total amount of each related Receivable.  All Receivables, whether reflected on the Financial Statements or incurred after the date of the Financial Statements, arose from *bona fide* sale transactions of the Company, and no portion of any Receivable is subject to counterclaim, defence or set-off or is otherwise in dispute of which the Senior Officers are aware.  Except to the extent of the recorded reserve for doubtful accounts, all of the Receivables are collectible in the ordinary course of business within 120 days of the due date.

**3.12**    <u>Condition of Assets; Business; Title</u>.

**(a)**    <u>Condition of Assets; Business</u>.  To the best knowledge of the Senior Officers, the buildings, fixtures, improvements, machinery, equipment, tools, furniture, improvements and tangible personal property of the Company are in all material respect in good operating condition and are suitable for the purposes for which they are used in the Business. The Company is engaged in the Business and no other business.  All of the Company's assets required to be reflected under GAAP, are reflected on the Financial Statements or, under

GRESCHNER 716

- 18 -

Accounting Principles, are not required to be reflected thereon and include substantially all assets that are necessary for use in and operation of the Business in the same manner as is carried on by the Company on the date hereof.

(b)    **Title.**  The Company has good and marketable title to all of its Real Property and good and valid title to all other assets, free and clear of all of Encumbrances, except for those Encumbrances disclosed in Schedule 3.12(b) attached hereto.

3.13    **No Pending Litigation or Proceedings.**  Except as described on Schedule 3.13, no action, suit, investigation, claim or proceeding whether civil, criminal or administrative, by or before any Governmental Body or arbitrator ("**Litigation**") has been commenced or, to the best knowledge of the Senior Officers, threatened against or affecting the Company, the Business, any of the Company's assets, any of the Company Shares, or any of the transactions contemplated by this Agreement or any Other Agreement, and to the best knowledge of the Senior Officers, there is no basis for any Litigation being commenced which would have any reasonable likelihood of success.  The Company has not been a party to any other Litigation during the past five (5) years.  There is presently no outstanding judgment, decree or order of any Governmental Body against or affecting the Company, the Business, any of the Company's assets, any of the Company Shares, or any of the transactions contemplated by this Agreement or any Other Agreement.  Except as described in Schedule 3.13 the Company has not commenced any Litigation against any third party.

3.14    **Contracts; Compliance.**  Disclosed on Schedules 3.14, 3.16, 3.20, 3.21 or 3.22, each of which are attached hereto, is a brief description of each contract, lease, indenture, mortgage, instrument, commitment or other agreement, arrangement or understanding, oral or written, formal or informal, to which the Company is a party or by which it or its assets may be affected, except for service agreements whose annual contract price is less than $10,000, and that (i) is material to the Business or the Company's assets or operations, individually or in the aggregate, (ii) involves the purchase, sale or lease of any asset, materials, supplies or services in excess of $10,000 per year, (iii) has an annual rent charge of more than $10,000 and an unexpired term of more than twelve (12) months from the date hereof, taking into account the effect of any renewal options, (iv) relates to the borrowing or lending of any money or guarantee of any obligation, (v) limits the right of the Company to compete in any line of business or otherwise restricts any right the Company may have, (vi) is an employment or consulting contract with a value in excess of $5,000 in any financial year, involving payment of compensation and benefits, or (vii) was not entered into in the ordinary course (each, a "**Contract**" and collectively, the "**Contracts**").  Each Contract is a legal, valid and binding obligation of the Company and is in full force and effect.  To the best knowledge of the Senior Officers, the Company and each other party to each Contract has performed all material obligations required to be performed by it thereunder and is not in material breach or default, and is not alleged to be in material breach or default, in any respect thereunder, and no event has occurred and no condition or state of facts exists (or would exist upon the giving of notice or the lapse of time or any of them) that would become or cause a material breach, default or event of default thereunder, would give to any Person the right to cause such a termination or would cause an acceleration of any obligation thereunder.  The Company is not currently

renegotiating any Contract having a value in excess of $10,000, except for those Contracts disclosed on Schedule 3.14 attached hereto, nor has the Company received any notice of non-renewal or price increase or sales or production allocation with respect to any Contract.

**3.15** **Permits; Compliance With Law.**  The Company holds all material permits, certificates, licenses, franchises, privileges, approvals, registrations and authorizations required under any applicable Law or otherwise advisable in connection with the operation of its assets and Business (each, a **"Permit"** and collectively, **"Permits"**).  Each Permit is valid, subsisting and in full force and effect.  The Company is in compliance with and has fulfilled and performed its obligations under each Permit, and, to the best knowledge of the Senior Officers, no event or condition or state of facts exists (or would exist upon the giving of notice or lapse of time or any of them) that could constitute a breach or default under any Permit.  Since September 1992, the Company has received no notice of any violation of Law, and, to the best knowledge of the Senior Officers, has not been during the past five (5) years nor is it currently in violation of any Law and has received no notice of any violation of Law, and no event has occurred or condition or state of facts exists that could give rise to any such violation.  The Company has not received any notice of non-renewal of any Permit.

**3.16** **Real Property.**  Schedule 3.16, attached hereto, discloses and summarizes all real properties currently owned, used or leased by the Company or in which the Company has an interest (collectively, the **"Real Property"**) and identifies the registered holder of all of the Real Property.  The Company has good and marketable fee simple title to (or a leasehold interest in, as the case may be) all Real Property shown as owned by it on Schedule 3.16, free and clear of all Encumbrances other than Encumbrances set out in Schedule 3.16.  The Company has the right to quiet enjoyment of all Real Property in which it holds a leasehold interest for the full term, including all renewal rights, of the lease or similar agreement relating thereto.  Copies of all surveys in the possession of the Company relating to the Real Property owned or leased by the Company have been delivered to Buyer.  All structures and other improvements on all Real Property owned by the Company are within the lot lines and do not encroach in any material way on the properties of any other Person, and the use and operation of all Real Property conform to all applicable building, zoning, safety and subdivision Laws, Environmental Laws and other Laws, and all restrictive covenants and restrictions and conditions affecting title.  The Company has not received any notice of, or assessments for, public improvements or condemnation against any Real Property.

**3.17** **Transactions With Related Parties.**  To the best knowledge of each Seller, no Related Party is or has been during the past five (5) years a party to any transaction, agreement or understanding with the Company except pursuant to arrangements disclosed on Schedule 3.17, attached hereto.  To the best knowledge of each Seller, no Related Party uses any assets of the Company except directly in connection with the Business, and no Related Party owns any asset used in the Business.  To the best knowledge of each Seller, no Related Party has any claim of any nature, including any inchoate claim, against the Company, and the Company has no claim of any nature, including any inchoate claim, against any Related Party.  Except as disclosed on Schedule 3.17 attached hereto, as otherwise expressly provided hereby or by any Other Agreement or as otherwise may be mutually agreed after Closing, (i) no Related Party will at

- 20 -

any time after Closing for any reason, directly or indirectly, be or become entitled to receive any payment or transfer of money or other property of any kind from the Company, and (ii) the Company will not at any time after Closing for any reason, directly or indirectly, be or become subject to any obligation to any Related Party.

**3.18**    **Labour Relations.**  No employee of the Company is represented by any union or other labour organization.  No representation election, arbitration proceeding, grievance, labour strike, dispute, slowdown, stoppage or other labour trouble has commenced or, to the best knowledge of the Senior Officers, threatened against, involving, materially affecting or potentially materially affecting the Company.  The Company has not engaged in any unfair labour practices, nor has any complaint against the Company commenced or, to the best knowledge of the Senior Officers, been threatened regarding any alleged unfair labour practices by or on behalf of any employee of the Company.  The Company has no liability for sick leave, vacation time, severance pay or any similar item except as accrued or reserved for on its Financial Statements.  To the best knowledge of the Senior Officers, the Company has no contingent liability for any occupational disease of any of its employees, former employees or others.  Neither the execution and delivery of this Agreement, the performance of the provisions hereof nor the consummation of the transactions contemplated hereby will trigger any severance pay obligation under any contract or under any Law.

**3.19**    **Products Liability; Warranties.**  The Company shall have no financial liability after the Closing Date not fully covered by insurance or warranty reserves relating to any product manufactured, distributed or sold by the Company prior to the Closing Date, whether or not such liability relates to products that are defective or improperly designed or manufactured or in breach of any express or implied product warranty but such liability shall not extend to damages caused by defective servicing or other actions by the Company after Closing.  The attached Schedule 3.19 discloses and describes the terms of all express product warranties under which the Company may have liability after the Closing Date.

**3.20**    **Insurance.**  The attached Schedule 3.20 discloses all insurance policies with respect to which the Company is the owner, insured or beneficiary.  Such policies are reasonable, in both scope and amount, in light of the risks attendant to the Business.  The Company will not have any liability after the Closing for retrospective or retroactive premium adjustments, except as disclosed in the attached Schedule 3.20.  For the past five (5) years, all insurance policies covering products liability and general liability maintained by or for the benefit of the Company have been "occurrence" policies and not "claims made" policies.  The attached Schedule 3.20 discloses the manner in which the Company provides coverage for workers' compensation claims.

**3.21**    **Intellectual Property Rights.**  The attached Schedule 3.21 discloses all of the trade names, registered and unregistered trade-marks (whether used with wares or services), industrial designs and applications for registration of industrial designs, copyrights, and patents, as well as applications and licenses of any of the foregoing, as well as all other intellectual property, owned or used by the Company in or applicable to the Business.  Except as stated in Schedule 2.21 the Company has the entire right, title and interest in and to, or has the exclusive

- 21 -

perpetual royalty-free right to use, the intellectual and industrial property rights disclosed on the attached <u>Schedule 3.21</u> and all other processes, know-how, show-how, formulae, trade secrets, inventions, discoveries, improvements, blueprints, specifications, drawings, designs, and other proprietary rights necessary or applicable to or advisable for use in the Business ("**Intellectual Property**"), free and clear of all Encumbrances. The attached <u>Schedule 3.21</u> separately discloses all Intellectual Property under license. The Intellectual Property is valid and not the subject of any interference, opposition, reexamination or cancellation. To the best knowledge of the Senior Officers, no Person is infringing upon nor has any Person misappropriated any Intellectual Property. The Company is not infringing upon the intellectual property rights of any other Person.

**3.22**        <u>**Canadian Employee Benefits**</u>.

(a)        <u>**Benefit Plans; Company Plans**</u>. The attached <u>Schedule 3.22</u> discloses all written and unwritten "employee benefit plans" and any other written and unwritten profit sharing, pension, savings, deferred compensation, fringe benefit, insurance, medical, medical reimbursement, dental, life, disability, accident, post-retirement health or welfare benefit, share option, share purchase, sick pay, vacation, employment, severance, termination or other plan, agreement, contract, policy, trust fund or arrangement ever existing in Canada for the benefit of Canadian employees, whether or not funded and whether or not terminated, (i) maintained or sponsored by the Company, or (ii) with respect to which the Company (or Sellers with respect to the Company) has or may have liability or is obligated to contribute, or (iii) that is maintained or sponsored by the Company and otherwise covers any of the current or former employees of the Company or any predecessor thereto or their beneficiaries, or as to which any such current or former employees or their beneficiaries participated or were entitled to participate or accrue or have accrued any rights thereunder (each, a "**Company Plan**").

(b)        <u>**Company Plan**</u>. Each Company Plan has been established, maintained, funded, registered, qualified, invested and administered, in all respects, in substantial compliance with its terms and with the requirements prescribed by any and all statutes, orders, rules having the force of law and regulations that are applicable to such Company Plan. No improvements to any Company Plan have been promised by the Sellers or the Company, and no improvements will be made or promised prior to Closing except as disclosed in writing to the Buyer. All pension plans maintained or required to be maintained by the Company are duly registered under, and have been maintained in compliance in all material respects with the requirements for registration prescribed by the ITA, the regulations thereunder and the administrative policies of Revenue Canada.

(c)        <u>**No Defined Benefit Plans**</u>. No Company Plan is or has been a benefit plan pursuant to which a beneficiary under the plan is entitled to a pension not determined solely by monies contributed to the plan (a "**Defined Benefit Plan**").

(d)        <u>**Company Plan Amendment**</u>. The Company may unilaterally amend, modify, vary, revoke or terminate, in whole or in part, each Company Plan.

- 22 -

(e)  **Company Plan Funding; Insurance.** Each Company Plan is fully funded or fully insured.  No insurance policy or any other contract or agreement affecting the Company Plans requires or permits a retroactive increase in premiums or payments due thereunder.  The level of insurance reserves under each insured Company Plan is reasonable and sufficient to provide for all incurred but unreported claims.

3.23     **U.S. Employee Benefits.**

(a)  **U.S. Benefit Plans; U.S. Company Plans.**  Schedule 3.23 discloses all written and unwritten "employee benefit plans" within the meaning of Section 3(3) of ERISA, and any other written and unwritten profit sharing, pension, savings, deferred compensation, fringe benefit, insurance, medical, medical reimbursement, dental, life, disability, accident, post-retirement health or welfare benefit, stock option, stock purchase, sick pay, vacation, employment, severance, termination or other plan, agreement, contract, policy, trust fund or arrangement (each, a "U.S. Benefit Plan"), whether or not funded and whether or not terminated, (i) maintained or sponsored by the Company, or (ii) with respect to which the Company has or may have liability or is obligated to contribute, or (iii) that is maintained or sponsored by the Company and that otherwise covers any of the current or former employees of the Company or their beneficiaries, or as to which any such current or former employees or their beneficiaries participated or were entitled to participate or accrue or have accrued any rights thereunder (each, a "U.S. Company Plan").  Except as set forth in Schedule 3.23, no U.S. Company Plan covers any employees of any member of the Company in any country or territory other than the United States.  Except as set forth in Schedule 3.19, and with the exception of the requirements of Section 4980B of the Code or any applicable state law, no post-retirement benefits are provided under any U.S. Company Plan that is a welfare benefit plan as described in ERISA Section 3(1).

(b)  **Company Group Matters; Funding.**  Neither the Company nor any corporation that may be aggregated with the Company under Sections 414(b),(c),(m) or (o) of the Code (the "Company Group") has any obligation to contribute to or any liability under or with respect to any Benefit Plan of the type described in Sections 4063 and 4064 of ERISA or Section 413(c) of the Code.  The Company has no liability, and after the Closing Date, in respect of any matter arising or occurring prior to the Closing Date, Buyer will have no liability, with respect to any U.S. Benefit Plan of any member of the Company Group, whether as a result of delinquent contributions, distress terminations, fraudulent transfers, failure to pay premiums to the PBGC or any multi-employer plan, withdrawal liability or otherwise, except as disclosed in Schedule 3.23.  No accumulated funding deficiency (as defined in Section 302 of ERISA and Section 412 of the Code) exists nor has any funding waiver from the IRS been received or requested with respect to any U.S. Plan or any U.S. Benefit Plan of any member of the Company Group and no excise or other Tax is due or owing because of any failure to comply with the minimum funding standards of the Code or ERISA with respect to any of such plans, except as disclosed in Schedule 3.23.

GRESCHNER721

- 23 -

(c)    **Compliance.**  Each U.S. Company Plan and all related trusts, insurance contracts and funds have been created, maintained, funded and administered in all material respects in compliance with ERISA, the Code and any regulations thereunder or relating thereto and in compliance with the plan document, trust agreement, insurance policy or other writing creating the same or applicable thereto.  No U.S. Company Plan is currently under audit or investigation or has received written notice from a government body of a current intent to audit, and no completed audit of any U.S. Company Plan has resulted in the imposition of any Tax, fine or penalty except as disclosed in Schedule 3.23.

(d)    **Qualified Plans.**  Schedule 3.23 discloses each U.S. Company Plan that purports to be a qualified plan under Section 401(a) of the Code and exempt from United States federal income tax under Section 501(a) of the Code (a "**Qualified Plan**").  With respect to each Qualified Plan, a current determination letter issued pursuant to the *Tax Reform Act* of 1986 has been received from the IRS stating that such plan is qualified under Section 401(a) of the Code and exempt from federal income tax under Section 501(a) of the Code.  Except as disclosed on Schedule 3.23, no Qualified Plan has been amended since the date of the most recent such letter.  To the best knowledge of the Senior Officers, no member of the Company Group, nor any fiduciary of any Qualified Plan, nor any agent of any of the foregoing, has done or failed to do anything that would adversely affect the qualified status of a Qualified Plan or the qualified status of any related trust.

(e)    **Defined Benefit Plans.**  There are no U.S. Company Plans that are defined benefit plans as defined in Section 3(35) of ERISA (a "**U.S. Defined Benefit Plan**").  No U.S. Defined Benefit Plan sponsored by any member of or covering any employee of the Company Group has been terminated or partially terminated since September 1, 1974.  No event has occurred and no condition has existed that could constitute grounds under Section 4042 of ERISA for termination of or appointment of a trustee to administer any U.S. Defined Benefit Plan.  No member of the Company Group has transferred, in whole or in part, a U.S. Defined Benefit Plan to a corporation that was at the time of transfer a member of a different controlled group of corporations (within the meaning of Section 4001(a)(14) of ERISA) than the transferor.  The Company has no liability for any U.S. Company Plan that is not accrued on the Financial Statements in accordance with Financial Accounting Standards 87 and 88, or, if arising after the Balance Sheet Date and on and before the Closing Date, will not be accrued on the Company's financial statements.  Each Defined Benefit Plan identified as terminated on Schedule 3.23 has met the requirement for standard termination of single-employer plans contained in Section 4041(b) of ERISA.  During the five (5) year period ending on the Closing Date, no member of the Company Group has transferred a Defined Benefit Plan to a corporation that was not, at the time of transfer, related to the transferor in any manner described in Sections 414(b), (c), (m) or (o) of the Code.

(f)    **U.S. Multiemployer Plans.**  No U.S. Company Plan is a multiemployer plan within the meaning of Section 3(37) or Section 4001(a)(3) of ERISA (a "**U.S. Multiemployer Plan**").  No member of the Company Group has withdrawn from any U.S. Multiemployer Plan or incurred any withdrawal Liability to or under any Multiemployer Plan.

- 24 -

(g) **Prohibited Transactions; Fiduciary Duties.** No prohibited transaction (within the meaning of Section 406 of ERISA and Section 4975 of the Code) with respect to any U.S. Company Plan exists or has occurred that could subject the Company to any Liability or Tax under Part 5 of Title I of ERISA or Section 4975 of the Code. To the best knowledge of the Senior Officers, no member of the Company Group, nor any administrator or fiduciary of any Company Plan, nor any agent of any of the foregoing, has engaged in any transaction or acted or failed to act in a manner that will subject the Company to any liability for a breach of fiduciary or other duty under ERISA or any other applicable Law. With the exception of requirements of Section 4980B of the Code, no post-retirement benefits are provided under any Company Plan that is a welfare benefit plan as described in ERISA Section 3(1).

(h) **Termination of 401(k) Plan.** No fees or charges will be owing, and no withdrawals shall be required, in connection with the termination of Company's 401(k) Plan or the merger of such plan into USF's plan or in connection with the withdrawal of funds from Company's plan.

3.24    **Environmental Matters.**

(a) **Compliance; No Liability.** The Company has operated the Business and each parcel of Real Property (as well as real property not currently used by the Company but formerly so used, whether owned or leased) in material compliance with all applicable Environmental Laws. The Company is not subject to any liability, penalty or expense (including legal fees) and will not hereafter suffer or incur any loss, liability, penalty or expense (including legal fees) by virtue of any violation of any Environmental Law occurring prior to the Closing.

(b) **Treatment; CERCLIS.** In the United States, the Company has not treated, stored, recycled or disposed of any Regulated Material on any real property, and no other Person has treated, stored, recycled or disposed of any Regulated Material on any part of the Real Property. The Company has not transported any Regulated Material or arranged for the transportation of any Regulated Material to any location that is listed or proposed for listing on the National Priorities List pursuant to Superfund, on CERCLIS or any other location that is the subject of federal, state or local enforcement action or other investigation that may lead to claims against the Company for cleanup costs, remedial action, damages to natural resources, to other property or for personal injury including claims under Superfund. The Real Property is not listed or, to the knowledge of Seller or the Company, proposed for listing on the National Priorities List pursuant to Superfund, CERCLIS or any state or local list of sites requiring investigation or cleanup.

(c) **Notices; Existing Claims; Certain Regulated Materials; Storage Tanks.** The Company has not received any request for information, notice of claim, demand or other notification that it is or may be potentially responsible with respect to any investigation, abatement or cleanup of any threatened or actual release of any Regulated Material. There has been no past, and there is no currently outstanding or to the best knowledge of the Senior Officers contemplated, claim by or against the Company under any Environmental Law or Laws based on actions of others that may have impacted on the Real Property, and the Company has

GRESCHNER 723

- 25 -

not entered into any agreement with any Person regarding any Environmental Law, remedial action or other environmental liability or expense.

All storage tanks located on the Real Property, whether underground or aboveground, are disclosed on <u>Schedule 3.24 (b)</u>, and all such tanks and associated piping are in sound condition and are not leaking and have not leaked.

**3.25** **Personal Property Leases.** <u>Schedule 3.25</u> lists all the personal property leased by the Company and having annual lease payment obligations in excess of $10,000 ("**Personal Property Leases**") and identifies the ones which cannot be terminated by the Company without liability at any time upon less than 30 days' notice or which involve payment by it in the future of more than $10,000. Each Personal Property Lease is in full force and effect and has not been amended, and the Company is entitled to the full benefit and advantage of each Personal Property Lease in accordance with its terms. Each Personal Property Lease is in good standing and to the best knowledge of the Senior Officers there has not been any default by any party under any Personal Property Lease.

**3.26** **Customer Relations.** Except as set forth on <u>Schedule 3.26</u>, to the best knowledge of the Senior Officers, there exists no condition or state of facts or circumstances involving the Company's customers, suppliers, distributors or sales representatives that the Company or Sellers can reasonably foresee would materially adversely affect the Business after the Closing Date.

**3.27** **Investment Representation.** Sellers acquiring USF Shares under the Shelf Registration Statement are acquiring the USF Shares for their own account and not with a view to the distribution thereof. During the course of the negotiation of this Agreement, Sellers have had the opportunity to ask questions of and obtain information from representatives of Buyer concerning Buyer, USF and the USF Shares. Twenty days prior to the execution of this Agreement by the Sellers, each Seller received a copy of the prospectus of USF dated April 2, 1997. In addition, each Seller received a copy of the prospectus of USF dated September 15, 1997.

**3.28** **Finders' Fees.** Each Seller represents that neither it nor, if incorporated, any of their respective officers, directors or employees nor WCI has employed any broker or finder or incurred any liability for any brokerage fee, commission or finders' fee in connection with any of the transactions contemplated hereby or by any Other Agreement.

**3.29** **Pooling.** Except as set out in Schedule 3.29, during the past twenty-four (24) months: (i) neither Sellers, nor the Company has purchased or otherwise acquired any of its common stock or any securities convertible into or rights to acquire its common stock; (ii) neither Sellers nor the Company has issued any equity securities in contemplation of the transactions contemplated by this Agreement; (iii) neither Sellers, nor the Company has been a Subsidiary or division of another corporation; (iv) neither Sellers, nor the Company has issued any warrants or options to purchase common stock; (v) amounts paid to Sellers, if any, for services rendered, expense reimbursement and management fees have been for valid and

GRESCHNER 724

- 26 -

reasonable business purposes; (vi) the Company has not disposed of a material amount of its assets, other than disposals in the ordinary course of business or pursuant to financing transactions. To the best knowledge of the Sellers, neither Sellers, nor the Company has taken any other action or failed to take any other action which action or failure would cause the transactions contemplated herein not to be treated as a pooling of interests for accounting purposes under U.S. generally accepted accounting principles.

**3.30**     <u>Disclosure</u>.  None of the representations or warranties of Sellers or the Company contained herein and none of the information contained in the Schedules referred to in <u>Article III</u> is false or misleading in any material respect or to the best knowledge of the Sellers omits to state a fact herein or therein necessary to make the statements herein or therein not misleading in any material respect.

**3.31**     <u>Prepayment Penalties</u>.  No prepayment penalties or similar fees are required to be paid in connection with the retirement of the Bank Debt other than debts owing to Canadian Imperial Bank of Commerce.

## ARTICLE IV
## <u>REPRESENTATIONS AND WARRANTIES OF BUYER</u>

As an inducement to Sellers to enter into this Agreement and consummate the transactions contemplated hereby, each of USF and Buyer jointly and severally represents and warrants to Sellers as follows:

**4.1**     <u>Organization</u>.  USF and Buyer are corporations duly organized, validly existing and in good standing under the laws of the State of Delaware and the Province of Ontario, respectively, and each has the corporate power and authority to own or lease its properties, carry on its business, enter into this Agreement and the Other Agreements to which it is or is to become a party and perform its obligations hereunder and thereunder.

**4.2**     <u>Authorization; Enforceability</u>.  This Agreement and each Other Agreement to which Buyer or USF is a party, respectively, have been duly executed and delivered by and constitute the legal, valid and binding obligations of Buyer and USF, respectively, enforceable in accordance with their respective terms.  Each Other Agreement to which Buyer and USF is to become a party pursuant to the provisions hereof, when executed and delivered by Buyer or USF, will constitute the legal, valid and binding obligation of Buyer and USF, respectively, enforceable against Buyer and USF, as appropriate, in accordance with the terms of such Other Agreement.  All actions contemplated by this Section have been duly and validly authorized by all necessary proceedings by Buyer and USF.

**4.3**     <u>No Violation of Laws; Consents</u>.  Neither the execution and delivery of this Agreement or any Other Agreement to which Buyer or USF is or is to become a party, the consummation of the transactions contemplated hereby or thereby nor the compliance with or

GRESCHNER725

fulfilment of the terms, conditions or provisions hereof or thereof by Buyer or USF will: (i) contravene any provision of the Governing Documents of Buyer or USF, or (ii) violate any Law or any judgment or order of any Governmental Body to which Buyer or USF is subject or by which any of its assets may be bound or affected.  Except for listing of the USF Shares on the NYSE, the effectiveness of the Shelf Registration Statement and approval of the transactions contemplated hereby by the boards of directors of USF and Buyer, no consent, approval or authorization of, or registration or filing with, any Person is required in connection with the execution or delivery by Buyer of this Agreement or any of the Other Agreements to which Buyer is or is to become a party pursuant to the provisions hereof or the consummation by Buyer of the transactions contemplated hereby or thereby.

**4.4     No Pending Litigation or Proceedings.**  No Litigation is pending or, to the knowledge of USF or Buyer, threatened against or affecting USF or Buyer in connection with any of the transactions contemplated by this Agreement or any Other Agreement to which Buyer or USF is or is to become a party.  There is presently no outstanding judgment, decree or order of any Governmental Body against or affecting Buyer or USF in connection with the transactions contemplated by this Agreement or any Other Agreement to which Buyer or USF is or is to become a party.

**4.5     Capitalization.**  The authorized capital  stock of USF consists of 300,000,000 shares of common stock. The authorized capital of Buyer consists of an unlimited number of common shares and an unlimited number of Retractable Shares.  The USF Shares and the Retractable Shares to be issued to Sellers pursuant to this Agreement and the Exhibits thereto will be duly authorized, validly issued, fully paid and non-assessable and not subject to preemptive rights created by statute, the Governing Documents or any agreement to which the Buyer or USF is a party or is bound.  So long as any Seller owns Retractable Shares, the Retractable Share provisions will not be amended without such Seller's consent.

**4.6     Finders' Fees.**  None of USF, Buyer or any of its officers, directors or employees has employed any broker or finder or incurred any liability for any brokerage fee, commission or finders' fee in connection with any of the transactions contemplated hereby.

**4.7     Material Financial Change.**  There has been no material change in the financial condition, assets, liabilities, business or operations of USF since the date of the last annual report on Form 10-K which has not been disseminated to the public in the ordinary course.

**4.8     U.S. Securities Laws.**      With respect to the USF Shares issued under the Shelf Registration Statement to Sellers at Closing:

(a)      The shares of USF Common Stock are being sold to the Sellers pursuant to the Prospectus referred to in section 3.27 and the Shelf Registration Statement.  The other documents filed by USF since March, 1997 under the Securities Act and the *United States Securities Exchange Act of 1934*, as amended (the "Exchange Act") and incorporated by reference in the Shelf Registration Statement and the Prospectus or any amendment or supplement thereto (the "USF SEC Reports") comply in all material respects with the Securities

- 28 -

Act and the Exchange Act. The USF SEC reports constitute the only reports required to be filed by USF with the SEC since March 31, 1997. The USF SEC Reports did not at the time they were filed, or will not at the time they are filed, contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary in order to make the statements made therein, in light of the circumstances under which they were or are made, not misleading.

(b)    The Shelf Registration Statement has been declared effective by the SEC. Neither the SEC or any other regulatory authority has issued any order preventing or suspending the effectiveness or use of the Shelf Registration Statement or the prospectus and no proceedings for a stop order preventing or suspending the effectiveness or use of the Shelf Registration Statement or the prospectus have been instituted or are pending or threatened.

(c)    The shares of USF Common Stock to be issued to the Sellers upon the consummation of the transactions contemplated by this Agreement will be issued pursuant to the Shelf Registration Statement and will be freely tradeable, subject to the pooling requirements and the provisions of Rule 145 under the United States Securities Act. The certificates representing such shares will not bear any legend noting that they are restricted securities other than the Rule 145 Legend.

(d)    The USF shares to be issued to the Sellers have been authorized for listing on the NYSE.

(e)    Until the Sellers have disposed of all their shares of USF Common Stock for cash, USF agrees that (i) it will use file on a timely basis all reports required to be filed by it under the Securities Act and the Exchange Act, and (ii) will not take any action that would cause USF to be delisted on the NYSE.

## ARTICLE V
## CERTAIN COVENANTS

**5.1**    **Conduct of Business Pending Closing.** From and after the date hereof and until the Closing Date, unless Buyer shall otherwise consent in writing, the Company shall, and Sellers shall cause the Company to, conduct its affairs as follows:

(a)    **Ordinary Course; Compliance.** The Business shall be conducted only in the ordinary course and consistent with past practice. The Company shall maintain its property, equipment and other assets consistent with past practice and shall comply in a timely fashion with the provisions of all Contracts and Permits and its other agreements and commitments. The Company shall use its reasonable best efforts to keep its Business intact, keep available the services of its present employees and preserve the goodwill of its suppliers, customers and others having business relations with it. The Company shall maintain in full force and effect the policies of insurance disclosed on Schedule 3.20, subject only to variations

GRESCHNER 727

- 29 -

required by the ordinary operations of the Business, or else shall obtain, prior to the lapse of any such policy, substantially similar coverage with insurers of recognized standing.

(b)    **Transactions.**  The Company shall not:  (i) except for the transaction described in Section 2.3 hereof, amend its Governing Documents; (ii) change its authorized or issued capital or issue any Security Rights with respect to shares of its capital; (iii) enter into any contract or commitment the performance of which may extend beyond the Closing, except those made in the ordinary course of business, the terms of which are consistent with past practice; (iv) enter into any employment or consulting contract or arrangement that is not terminable at will and without penalty or continuing obligation; (v) fail to pay any Tax or any other liability or charge when due, other than charges contested in good faith by appropriate proceedings; (vi) make, change or revoke any Tax election or make any agreement or settlement with any taxing authority; (vii) take any action or omit to take any action that will cause a breach or termination of any Contract, other than termination by fulfilment of the terms thereunder; or (viii) increase any employee's salary, wage, benefits or bonus, or increase the number of employees of Company, provided that Joe Morrison will be paid a bonus of $100,000 prior to Closing.

5.2    **Access, Information and Documents.**  Sellers and the Company shall give to Buyer and to Buyer's employees and representatives (including accountants, actuaries, attorneys, environmental consultants and engineers) access during normal business hours to all of the properties, books, Tax Returns, contracts, commitments, records, officers, personnel and accountants (including independent public accountants and their audit workpapers concerning the Company) of the Company and shall furnish to Buyer all such documents and copies of documents and all information with respect to the properties, liabilities and affairs of the Company and the Subsidiaries as Buyer may reasonably request.

5.3    **Certain Tax Matters**

(a)    **Tax Returns and Payment of Taxes for Periods Through the Closing Date.**  Sellers shall cause the Company to make provision in its Financial Statements for any federal, state and provincial Tax of the Company for all taxable periods up to and including the Closing Date.  The income of the Company shall be apportioned for the period up to and including the Closing Date and the period after the Closing Date by closing the books of Company as of the close of business on the Closing Date.

(b)    **Carrybacks.**  If the Company is required to carry back any item of loss, deduction or credit that arises in any taxable period ending after the Closing Date to a Tax Return  for any taxable period ending on or before the Closing Date, the Company will be entitled to retain any refund or credit of Taxes realized as a result thereof.

(c)    **Mutual Cooperation.**  Buyer and Sellers shall each provide the other, and Buyer shall cause the Company to provide Sellers, with such assistance as may reasonably be requested by any of them in connection with the preparation of any Tax Return, any Tax audit, or any judicial or administrative proceedings relating to any Tax, and each will retain and

provide the other with any records or information that may be relevant to such Tax Return, Tax audit, proceeding or determination. The party requesting assistance hereunder shall reimburse the other for direct expenses incurred in providing such assistance.

**5.4**    **Covenant Not to Compete.**

(a)    **Restriction**. For a period of two years from and after the Closing Date, each of Will Slobodian, Dwight F. Auramenko and Norm Reise agree that he shall not, except as an officer or employee of USF, Buyer, the Company or their Affiliates, directly or indirectly, own, manage, operate, join, control or participate in the ownership, management, operation or control of, or be employed or otherwise connected as an officer, employer, shareholder, partner or otherwise with, any business that at any relevant time during such period directly or indirectly competes with the Business in Canada or the United States including, without limitation, any State in which the Company currently conducts its business. Ownership of not more than 2% of the outstanding shares of any publicly traded company shall not be a violation of this Section 5.4.

(b)    **Enforcement**. The restrictive covenant contained in this Section is a covenant independent of any other provision of this Agreement and the existence of any claim that Seller may allege against any other party to this Agreement, whether based on this Agreement or otherwise, shall not prevent the enforcement of this covenant. Sellers agree that Buyer's remedies at law for any breach or threat of breach by Sellers of the provisions of this Section will be inadequate, and that Buyer shall be entitled to an injunction or injunctions to prevent breaches of the provisions of this Section and to enforce specifically the terms and provisions hereof, in addition to any other remedy to which Buyer may be entitled at law or equity. In the event of litigation regarding this covenant not to compete, the prevailing party in such litigation shall, in addition to any other remedies the prevailing party may obtain in such litigation, be entitled to recover from the other party its reasonable legal fees and out of pocket costs incurred by such party in enforcing or defending its rights hereunder. The length of time for which this covenant not to compete shall be in force shall not include any period of violation or any other period required for litigation during which Buyer seeks to enforce this covenant. Should any provision of this Section be adjudged to any extent invalid by any competent tribunal, such provision will be deemed modified to the extent necessary to make it enforceable.

**5.5**    **Pooling**. During the period from the date of this Agreement through the Closing, unless the other parties shall otherwise agree in writing, none of Sellers or the Company shall knowingly take or fail to take any action which action or failure would cause the treatment of the transactions contemplated hereunder not to be a pooling of interests for accounting purposes, under U.S. generally accepted accounting principles.

**5.6**    **Seller Letters**. Each Seller shall deliver to Buyer prior to the Closing a written agreement (a "Seller Letter"), substantially in the form of Exhibit 6 hereto, providing that such Person will not sell, pledge, transfer or otherwise dispose of the USF Shares to be issued to such Person pursuant to this Agreement (i) except in compliance with the applicable provisions of the Securities Act and the rules and regulations thereunder and (ii) until such time as financial results

- 31 -

covering at least thirty (30) days of combined operations of Buyer have been published within the meaning of Section 201.01 of the SEC's Codification of Financial Reporting Policies. Buyer shall not be required to deliver any certificates evidencing USF Shares to any Seller from whom a Seller Letter has not been received.

**5.7**      **Publicity.**    Sellers shall not issue any press release or otherwise make any announcements to the public with respect to this Agreement without the prior written consent of the Buyer, except as required by Law.   This Section shall expire on the 30th day after the Closing Date.

**5.8**      **Fulfilment of Agreements.**  Each party hereto shall use its reasonable best efforts to cause all of those conditions to the obligations of the other under Article VI that are not beyond its reasonable control to be satisfied on or prior to the Closing and shall use its best efforts to take, or cause to be taken, all action and to do, or cause to be done, all things necessary, proper or advisable to consummate and make effective the transactions contemplated by this Agreement.

**5.9**      **[Sale of USF Shares.**   Each Seller agrees (i) to sell or cause their Canadian representative to sell the USF Shares only through Donaldson, Lufkin & Jenrette Securities Corporation or Deutsche Morgan Grenfell or such other brokerage company acceptable to Buyer and the Seller, and (ii) that the USF Shares will not be disposed of in any manner that will be disruptive to the market for the common stock of USF.

**5.10**     **Confidential Information.**  The Buyer and USF shall hold and shall cause to be held in confidence all information obtained from the Sellers both before and after the date hereof in connection with the transactions contemplated by this Agreement, other than information publicly available or which the Buyer or USF receive from other sources.  If for any reason the parties do not complete the transactions contemplated by this Agreement, the Buyer shall forthwith return to the Sellers all copies of any information, documents and data delivered by Sellers or the Company in connection with the transactions contemplated by this Agreement, continue to hold such information, other than information that is publicly available or which the Buyer or USF receive from other sources, in confidence and refrain from using such information to its advantage.

**5.11**     **Assignment of Receivables.**  Buyer will cause Company to assign to the Sellers any specific Receivable having an amount outstanding over $10,000 to the extent Buyer has included such Receivables as a basis for a claim for Buyer Damages and been paid therefor.

## ARTICLE VI
## CONDITIONS TO CLOSING; TERMINATION

**6.1**      **Conditions Precedent to Obligation of Buyer.**  The obligation of Buyer to proceed with the Closing under this Agreement is subject to the fulfilment prior to or at Closing

of the following conditions, any one or more of which may be waived in whole or in part by Buyer at Buyer's sole option:

    **(a)**    **Bringdown of Representations and Warranties; Covenants.**  Each of the representations and warranties of Sellers and the Company contained in this Agreement shall be true and correct in all material respects on the Closing Date, with the same force and effect as though such representations and warranties had been made on, as of and with reference to the Closing Date.  Each of Sellers and the Company shall have performed in all respects all of the covenants and complied with all of the provisions required by this Agreement to be performed or complied with by it at or before the Closing.

    **(b)**    **Litigation.**  No statute, regulation or order of any Governmental Body shall be in effect that restrains or prohibits the transactions contemplated hereby or that would limit or adversely affect Buyer's ownership of the Company Shares or control of the Company, and there shall not be any application made before any Governmental Body nor shall there have been threatened or have commenced, any action or proceeding by or before any Governmental Body challenging the lawfulness of or seeking to prevent or delay any of the transactions contemplated by this Agreement or any of the Other Agreements or seeking monetary or other relief by reason of the consummation of any of such transactions.

    **(c)**    **No Material Adverse Change.**  Between the date hereof and the Closing Date, there shall have been no material adverse change, regardless of insurance coverage therefor, in the Business or any of the assets, results of operations, liabilities, prospects or condition, financial or otherwise, of the Company.

    **(d)**    **Closing Certificate: Closing Documents.**  Sellers shall have delivered a certificate, dated the Closing Date, certifying to the fulfilment of the conditions set forth in subparagraphs (a), (b) and (c) of this Section 6.1.  Such certificate shall constitute a representation and warranty of Sellers with regard to the matters therein for purposes of this Agreement.  Buyer shall have received the other documents referred to in Section 6.3.  All agreements, certificates, opinions and other documents delivered by Sellers or the Company to Buyer hereunder shall be in form and substance satisfactory to counsel for Buyer, in the exercise of such counsel's reasonable professional judgment.

    **(e)**    **Accounting.**  Sellers shall have caused Buyer to receive from Ernst & Young, a letter, dated as of the Closing Date, in form and substance reasonably satisfactory to Buyer, to the effect that WCI is eligible to engage in the transactions contemplated hereunder such that the transaction of purchase and sale of the Company Shares would be accounted for as a pooling of interests accounting treatment under Accounting Principles Board Opinion No. 16 if closed and consummated in accordance with this Agreement.

    **(f)**    **Seller Letters.**  The Seller Letters shall have been delivered to Buyer.

**6.2**    **Conditions Precedent to Obligation of Sellers.**  The obligation of Sellers to proceed with the Closing under this Agreement is subject to the fulfilment prior to or at Closing

- 33 -

of the following conditions, any one or more of which may be waived in whole or in part by Sellers at Sellers' sole option:

        **(a)**    <u>**Bringdown of Representations and Warranties; Covenants**</u>. Each of the representations and warranties of Buyer and USF contained in this Agreement shall be true and correct in all material respects on and as of the Closing Date, with the same force and effect as though such representations and warranties had been made on, as of and with reference to the Closing Date. Buyer and USF shall have performed all of the covenants and complied in all respects with all of the provisions required by this Agreement to be performed or complied with by it at or before the Closing.

        **(b)**    <u>**Litigation**</u>. No statute, regulation or order of any Governmental Body shall be in effect that restrains or prohibits the transactions contemplated hereby, and there shall not have been threatened, nor shall there be pending, any action or proceeding by or before any Governmental Body challenging the lawfulness of or seeking to prevent or delay any of the transactions contemplated by this Agreement or the Other Agreements or seeking monetary or other relief by reason of the consummation of such transactions.

        **(c)**    <u>**Closing Certificate**</u>. Buyer and USF shall have delivered a certificate, dated the Closing Date, in such detail as Sellers shall request, certifying to the fulfilment of the conditions set forth in subparagraphs (a) and (b) of this <u>Section 6.2</u>. Such certificate shall constitute a representation and warranty of Buyer and USF with regard to the matters therein for purposes of this Agreement.

        **(d)**    <u>**Closing Documents**</u>. Sellers shall also have received the other documents referred to in <u>Section 6.4</u>. All agreements, certificates, opinions and other documents delivered by Buyer and USF to Sellers hereunder shall be in form and substance satisfactory to counsel for Sellers, in the exercise of such counsel's reasonable professional judgment.

**6.3**    <u>**Deliveries at the Closing by Sellers**</u>. Sellers shall deliver or cause to be delivered to Buyer at the Closing:

        **(a)**    Certificates representing the Company Shares duly endorsed for transfer together with any consents required to enable immediate transfer to the Buyer.

        **(b)**    Certificates of the appropriate public officials to the effect that the Company was a validly existing corporation in its jurisdiction of incorporation as of a date not more than ten (10) days prior to the Closing Date.

        **(c)**    Incumbency and specimen signature certificates dated the Closing Date, signed by the officers of the Company and certified by its Secretary.

        **(d)**    True and correct copies of the Governing Documents of the Company .

GRESCHNER 732

- 34 -

(e)    Certificates of the Secretary of the Company (A) setting forth all resolutions of the Board of Directors of the Company and, if necessary, the shareholders, authorizing the execution and delivery of this Agreement and the performance by the Company of the transactions contemplated hereby, and (B) to the effect that the Governing Documents of the Company, as the case may be, delivered pursuant to Section 6.3(d) were in effect at the date of adoption of such resolutions, the date of execution of this Agreement and the Closing Date.

(f)    General releases by all corporate officers and directors of the Company and by each Sellers of all liability of the Company or any Subsidiary to them and of any claim that they or any of them may have against the Company (exclusive of pension obligations).

(g)    The minute books, share certificate books and corporate seal of the Company.

(h)    The opinions of MacPherson Leslie & Tyerman, legal counsel to Sellers and Kanuka, Thuringer, legal counsel to the Company, in substantially the forms set out in Schedules 6.3.

(i)    Resignations of the corporate officers and directors of the Company effective at the Closing.

(j)    The endorsed share certificates described in Section 2.5(a) to be delivered to the Buyer's counsel.

**6.4    Deliveries at the Closing by Buyer.** Buyer shall deliver or cause to be delivered to Sellers at the Closing:

(a)    Share certificates as provided in section 2.5 evidencing the USF Shares duly registered in the name of the Sellers and registered at the address of the Sellers identified in Section 8.3 [using the respective Sellers' Federal tax identification numbers].

(b)    A certificate of the appropriate public official to the effect that Buyer is a validly existing corporation in the Province of Ontario as of a date not more than ten (10) days prior to the Closing Date.

(c)    Incumbency and specimen signature certificates signed by the officers of Buyer and certified by the Secretary or Assistant Secretary of Buyer.

(d)    The opinion of Blake, Cassels & Graydon, General Counsel to Buyer, in substantially the form of Schedule 6.4(e).

(e)    The opinion of Michael Hulme, Esq., Counsel to USF is substantially the form of Schedule 6.4(f).

- 35 -

**6.5**     **Termination.**  This Agreement, other than confidentiality obligations as set out in section 5.10 may be terminated at any time prior to Closing by:  (i) mutual consent of Buyer, Sellers and the Company; (ii) Buyer, if any of the conditions specified in Section 6.1 hereof shall not have been fulfilled by Sellers and shall not have been waived by Buyer; or (iii) Sellers, if any of the conditions specified in Section 6.2 hereof shall not have been fulfilled by Buyers or USF and shall not have been waived by Sellers.

**6.6**     **Investment Advisor.**  In the event that Sellers are not "accredited investors" or "qualified investors" pursuant to the *Securities Act*, (a) Sellers, or any one or more of them, may select and retain an investment advisor or representative of their choosing to assist them at such Sellers' sole cost and expense or (b) Sellers may select an investment advisor or representative provided by Buyer, the fees and costs associated with the employment of such investment advisor shall be paid by Sellers.

## ARTICLE VII
## SURVIVAL OF REPRESENTATIONS; INDEMNIFICATION

**7.1**     **Survival of Representations.**  Subject to section 7.5, all representations, warranties and agreements made by any party in this Agreement or pursuant hereto shall survive the Closing, but all claims for damages made by virtue of such representations, warranties and agreements shall be made under this Article VII.  The representations and warranties set forth in Articles III and IV are cumulative, and any limitation or qualification set forth in any one representation and warranty therein shall not limit or qualify any other representation and warranty therein.  After the Closing, the Company shall have no liability to Sellers for any breach of any representation or warranty made by Sellers or the Company to Buyer in this Agreement, in any certificate or document furnished pursuant hereto by Sellers or the Company or any Other Agreement to which Sellers or the Company, or any of them, is or is to become a party.

**7.2**     **Indemnification by Sellers.**  Subject to section 7.3 Sellers shall indemnify, defend, save and hold Buyer and its officers, directors, employees, agents and Affiliates (including, after the Closing, the Company) (collectively, **"Buyer Indemnitees"**) harmless from and against all demands, claims, actions or causes of action, assessments, losses, damages, deficiencies, liabilities, costs and expenses (including reasonable legal fees, interest, penalties, and all reasonable amounts paid in investigation, defence or settlement of any of the foregoing, whether or not the underlying demands or claims of third parties are meritorious (collectively, **"Buyer Damages"**) asserted against, imposed upon, resulting to, required to be paid by or incurred by any Buyer Indemnitees, in connection with, arising out of, (i) a breach of any representation or warranty made by Sellers in this Agreement, in any certificate or document furnished pursuant hereto by Sellers or the Company or any Other Agreement to which Sellers or the Company, or any of them, is or is to become a party, (ii) a breach or nonfulfillment of any covenant or agreement made by Sellers or the Company in or pursuant to this Agreement or in any Other Agreement to which Sellers or the Company, or any of them, is or is to become a party, (iii) noncompliance with or a violation of and any Buyer Damages with respect to

- 36 -

Environmental Laws for any period prior to Closing, (iv) Tax liabilities of the Company for all periods through the Closing Date for which adequate provision has not been made in the Financial Statements and from any liabilities for Taxes of Sellers with respect to which the Company may be liable, and (v) any liability of the Company arising as a result of litigation related to occurrences prior to Closing, including but not limited to the matters set out in Schedule 3.13. Notwithstanding the foregoing, the indemnity of the Sellers shall be separate and several as to each Seller for any Buyer's Damages based on any claim for breach of the representations and warranties in Sections 3.2, 3.3, 3.4, 3.17, 3.27 and 3.28 to the extent such representations and warranties are made separately by each Seller. Without in any way defeating any subrogated claim an insurer may have, Buyer shall not be entitled to be paid twice for the same Buyer Damages.

**7.3    <u>Limitation on Liability</u>.**

(a)  Notwithstanding the provisions of section 7.2, the aggregate liability of the Sellers, for all matters except:

(i)    title to Real Property, Intellectual Property and other personal property with an individual value over $1,500;

(ii)    any liability for Taxes related to periods prior to Closing and not adequately provided for in Financial Statements;

(iii)    litigation relating to periods prior to Closing;

(iv)    claims arising under Environmental Law; and

(v)    wilful misstatements or fraudulent conduct or Related Party transactions not disclosed on Schedule 3.17;

shall be limited to the escrow amount under Section 7.6 hereof.

(b)    Except for the matters referred to in Section 7.3(a)(i) to (v), no claim by Buyer may be made where the indemnification claim is, in the aggregate, less than $150,000 provided that, if the claim exceeds that amount, the full amount of the claim in excess of $50,000 is indemnifiable.

(c)    Except for claims against Sellers based on wilful statements or fraudulent conduct, the aggregate liability of any Seller for the matters specifically set out in paragraph 7.3(a) shall be limited to his or its total portion of the Purchase Price as set out in Section 2.5

(d)    Notwithstanding anything in this Section 7.3 contained, all claims by Buyer for indemnification from the Sellers pursuant to Section 7.2 shall be made first against the escrow amount under Section 7.6 hereof and only to the extent that such amount shall be insufficient to satisfy the claims so made shall the Buyer be entitled to pursue any claim against the Sellers

GRESCHNER735

- 37 -

for additional amounts, which claim shall in any event be restricted to the matters identified in Section 7.3(a) and shall be subject to the limit on aggregate liability of the Sellers in Section 7.3(c).

**7.4**        **Indemnification by Buyer.**  Buyer shall indemnify, defend, save and hold Sellers and their agents, representatives, successors and permitted assigns (collectively, **"Seller Indemnitees"**) harmless from and against any and all demands, claims, actions or causes of action, assessments, losses, damages, deficiencies, liabilities, costs and expenses (including reasonable legal fees, interest, penalties, and all reasonable amounts paid in investigation, defence or settlement of any of the foregoing, whether or not the underlying demands, claims, allegations, etc., of third parties are meritorious; collectively, **"Seller Damages"**) asserted against, imposed upon, resulting to, required to be paid by or incurred by any Seller Indemnitees, directly or indirectly, in connection with, arising out of, which could result in, or which would not have occurred but for, (i) a breach of any representation or warranty made by Buyer in this Agreement or in any certificate or document furnished pursuant hereto by Buyer or any Other Agreement to which Buyer is a party and (ii) a breach or nonfulfillment of any covenant or agreement made by Buyer in or pursuant to this Agreement and in any Other Agreement to which Buyer is a party.

**7.5**        **Time Limitation.**

        (a)        **Time Limitation.**  Except as set out in paragraph 7.5(b), no liability for any breach of a warranty or representation made pursuant to Article III hereof shall continue unless a claim is made therefor pursuant to section 7.7 on or prior to September 30, 1998, other than representations and warranties relating only to the Sellers as set out in sections 3.2, 3.3, 3.4, 3.17 and 3.28.

        (b)        Notwithstanding paragraph 7.5(a) above:

        (i)        Any claim based on breach of a representation and warranty as to title to Real Property, Intellectual Property and other personal property with an individual value over $1,500, within five years from Closing;

        (ii)        Any claim for liability with respect to Taxes may be made at any time within one year after the liability has been established or a notice of assessment or reassessment under the relevant taxing legislation has been received;

        (iii)        Any claim arising as a result of litigation relating to matters affecting the Company or Sellers prior to Closing.

**7.6**        **Escrow.**

        (a)        **Escrow.**  In order to secure Sellers obligations under Section 7.2, and to provide for the Post-Closing Purchase Price Adjustment as set out in Section 2.5, Buyer's Counsel, Blake, Cassels & Graydon shall hold in escrow (**"Escrow"**), pursuant to an Escrow Agreement

GRESCHNER736

- 38 -

in the form set out in Exhibit 5, for the benefit of Sellers and Buyer for a period of one year from the Closing Date, the USF Shares and the Retractable Shares, if any, identified in Section 2.5. In the event of a stock split occurring or stock dividends being declared or other adjustments being made to the USF Common Stock at any time during the period specified in this <u>Section 7.6</u>, the additional USF shares shall also be held in escrow and shall be included in the Escrow Shares. In connection with the shares held in escrow, Sellers shall execute and deliver to Buyer's counsel an assignment of share certificate (with the name of assignee left blank) in the form of attached Schedule 7.6. In addition to any shares delivered to Buyer as the Post-Closing Purchase Price Adjustment, Buyer shall, subject to the terms of the Escrow Agreement, be entitled to have returned to it or to USF that number of shares held in escrow with a value equal to the value of Buyer's Damages, and Sellers shall have no further right or claim thereto.

      **(b)**    <u>**Termination**</u>. The Escrow established pursuant to this <u>Section 7.6</u> shall terminate on the date that is one year from the Closing Date with respect to the Escrow Shares, provided, however, that the Escrow shall continue beyond such period to the extent that Buyer has given Sellers a notice of claim in accordance with Section 7.7 prior to the end of such period and the indemnification claims asserted therein remain unresolved. Upon termination of the Escrow in accordance with this <u>Section 7.6(b)</u>, Sellers shall be entitled to the delivery of the USF Shares or the Retractable Shares, as the case may be, retained in escrow which exceed the amount of any claim brought in accordance with the notice of claim required by <u>Section 7.7</u> and the Post-Closing Purchase Price Adjustment, if any. If no notice of claim is received in one year after the Closing Date, all shares then held in escrow shall be delivered to Sellers.

      **(c)**    Subject to the provisions of Section 7.3, if the claim relates only to the warranty of a specific Seller then the claim shall be satisfied from the Escrow Shares provided by that Seller as set out in Section 2.5. If the claim relates to all Sellers then the claim may be satisfied from any of the Escrow Shares deposited by all Sellers.

**7.7**      <u>**Notice of Claims**</u>. If any Buyer Indemnitee or Seller Indemnitee (an **"Indemnified Party"**) believes that it has suffered or incurred or will suffer or incur any Buyer Damages or Seller Damages, as the case may be (**"Damages"**), for which it is entitled to indemnification under this <u>Article VII</u>, such Indemnified Party shall so notify the party or parties from whom indemnification is being claimed (the **"Indemnifying Party"**) and all other parties to this agreement forthwith with reasonable particularity in light of the circumstances then existing. If any action at law or suit in equity is instituted by or against a third party with respect to which any Indemnified Party intends to claim any Damages, such Indemnified Party shall forthwith notify the Indemnifying Party of such action or suit. The failure of an Indemnified Party to give any notice required by this Section shall not affect any of such party's rights under this <u>Article VII</u> or otherwise except and to the extent that such failure is actually prejudicial to the rights or obligations of the Indemnified Party or has increased the amount of liability or the costs of defence.

**7.8**      <u>**Third Party Claims**</u>. The Indemnifying Party shall have the right to conduct and control, through counsel of its choosing, the defence of any third party claim, action or suit, and

the Indemnifying Party may compromise or settle the same, provided that the Indemnifying Party shall give the Indemnified Party advance notice of any proposed compromise or settlement. The Indemnifying Party shall permit the Indemnified Party to participate in the defence of any such action or suit through counsel chosen by the Indemnified Party, provided that the fees and expenses of such counsel shall be borne by the Indemnified Party. If the Indemnifying Party undertakes, conducts, or controls the conduct and settlement of such action or suit, (i) the Indemnifying Party shall not thereby permit to exist any Encumbrance upon any asset of the Indemnified Party; (ii) the Indemnifying Party shall not consent to any settlement that does not include as an unconditional term thereof the giving of a complete release from liability with respect to such action or suit to the Indemnified Party; and (iii) the Indemnifying Party shall agree promptly to reimburse the Indemnified Party for the full amount of any Damages including fees and expenses of counsel for the Indemnified Party incurred after giving the foregoing notice to the Indemnifying Party and prior to the assumption of the conduct and control of such action or suit by the Indemnifying Party.

**7.9**     **Good Faith Efforts to Settle Disputes.**  Buyer and Sellers agree that, prior to commencing any litigation against the other concerning any matter with respect to which such party intends to claim a right of indemnification in such proceeding, the authorized representatives of such parties shall meet in a timely manner and attempt in good faith to negotiate a settlement of such dispute during which time such representatives shall disclose to the others all relevant information relating to such dispute.  In the event that the parties are unable to amicably resolve the matter or matters in dispute, the parties shall submit all matters still in dispute to arbitration in accordance with the *International Commercial Arbitration Act* (Saskatchewan) as supplemented by the Commercial Arbitration Rules of the American Arbitration Association as supplemented by the Supplementary Procedures for International Commercial Arbitration.  Sellers shall select an arbitrator and Buyer shall select an arbitrator and the two arbitrators so selected shall select a third arbitrator.  The decision of the arbitrators shall be final and binding on the parties.  Such matter shall be submitted to arbitration within thirty (30) days from the date that either Sellers or Buyer declares that any matter in dispute cannot be amicably resolved.  All costs and expenses of arbitration shall be paid equally by Sellers on one hand and Buyer on the other.  Any cash or other monetary award shall be paid within thirty (30) days of the arbitrators final decision.  Arbitration shall be held in Regina, Saskatchewan.

**7.10**     **Payment.**  All indemnification payments for Buyer Damages under this Article VII shall be made by distributions from Escrow as provided herein shall be based on the Agreed USF Share Price of such Shares, unless any Seller shall elect at Closing to fund such payments in cash whenever a claim is decided, regardless of the market value of the USF Shares, against release from the Escrow of the number of shares so funded at the Agreed USF Share Price.  All Seller Damages shall be settled by a cash payment.

**7.11**     **Interest on Claims.**  The amount of any claim submitted under Section 7.7 or 7.8 as damages or by way of indemnification shall bear interest from and including the date any Indemnified Party is required to make payment in respect thereof at the Prime Rate calculated from and including such date to but excluding the date reimbursement of such Claim by the