- 40 -

Indemnifying Party is made, and the amount of such interest shall be deemed to be part of such Claim.

**7.12**     **GST Gross-up.**   The amount of any claim submitted under Section 7.7 or Section 7.8 as damages or by way of indemnification as determined without regard to this Section 7.12 shall be increased by an amount equal to the Goods and Services Tax applicable to such amount, if any.

**ARTICLE VIII**
**MISCELLANEOUS**

**8.1**     **Costs and Expenses.**   Subject to Sections 2.6(c), 7.9 and 8.10, Buyer and Sellers shall each pay its respective expenses, brokers' fees and commissions, and the parties hereby agree that the pre-Closing expenses of the Company incurred in connection with this Agreement and the transactions contemplated hereby, including all accounting, legal and appraisal fees and settlement charges shall be paid by the Sellers , other than legal due diligence costs and the costs of Ernst & Young related solely to pooling and not to tax complications of pooling.   All expenses, including costs and liabilities for Taxes or other matters related to the creation of the Retractable Shares of Buyer and the matters set forth in Exhibits relating thereto and other documentation thereto pertaining, including legal fees (estimated at $55,000) and audit fees in connection therewith incurred by Buyer up to Closing, shall be paid by Sellers on or before November 15, 1997 as well as its own expenses in connection therewith.   All such expenses incurred by Buyer after Closing shall be paid by Industria Capital Inc.   The obligations under this section are not subject to the limitations in Article 7.

**8.2**     **Further Assurances.**   Sellers shall, at any time and from time to time on and after the Closing Date, upon request by Buyer and without further consideration, take or cause to be taken such actions and execute, acknowledge and deliver, or cause to be executed, acknowledged and delivered, such instruments, documents, transfers, conveyances and assurances as may be required or desirable for the better conveying, transferring, assigning, delivering, assuring and confirming the Company Shares to Buyer or any of the assets used in the Business to the Company.

**8.3**     **Notices.**   All notices and other communications given or made pursuant to this Agreement shall be in writing and shall be deemed to have been duly given or made (i) the second business day after the date of mailing, if delivered by registered or certified mail, postage prepaid, (ii) upon delivery, if sent by hand delivery, (iii) upon delivery, if sent by prepaid courier, with a record of receipt, or (iv) the next day after the date of dispatch, if sent by cable, telegram, facsimile or telecopy (with a copy simultaneously sent by registered or certified mail, postage prepaid, return receipt requested), to the parties at the following addresses:

GRESCHNER 739

- 41 -

(i)     if to Buyer, to:

        c/o United States Filter Corporation
        40-004 Cook Street
        Palm Desert, CA  92211

        Attention:      Chief Executive Officer
        Telephone:      (760) 340-0098
        Facsimile:      (760) 346-4024

        with a copy to:

        United States Filter Corporation
        40-004 Cook Street
        Palm Street, California    92211

        Attention:      General Counsel
        Telephone:      (760) 340-0098
        Facsimile:      (760) 346-4024

        with a copy to:

        Blake, Cassels & Graydon
        Box 25, Commerce Court West
        Toronto, Ontario, Canada
        M5L 1A9

        Attention:      Warren M.H. Grover
        Telephone:      (416) 863-2709
        Facsimile:      (416) 863-2653

(ii)    if to Sellers other than Arva Investments Limited, to:

        Don Fettes,
        c/o MacPherson Leslie & Tyerman
        1500 - 1874 Scarth Street,
        Regina, Saskatchewan.
        S4P 4E9.

        Telephone: 306-347-8000
        Facsimile: 306-352-5250

GRESCHNER 740

- 42 -

(iii)    if to Arva Investments Limited to:

Arva Investments Limited
c/o John Stevens,
Osler, Hoskin & Harcourt,
Suite 3000
280 Park Avenue
New York N.Y. 10017

Telephone: 212-907-0501
Facsimile: 212-867-5802

with a copy in respect of any Seller to:

MacPherson Leslie & Tyerman
1500 - 1874 Scarth Street,
Regina, Saskatchewan.
S4P 4E9.

Telephone: 306-347-8000
Facsimile: 306-352-5250

Notices to the Company shall be addressed in care of Sellers before Closing and in care of Buyer after Closing. Any party hereto may change the address to which notice to it, or copies thereof, shall be addressed, by giving notice thereof to the other parties hereto in conformity with the foregoing.

**8.4**        **Currency.**   Unless otherwise indicated, all currency references herein are to Canadian dollars.

**8.5**        **Assignment; Governing Law.**   This Agreement and all the rights and powers granted hereby shall bind and inure to the benefit of the parties hereto and their respective permitted successors and assigns.   This Agreement and the rights, interests and obligations hereunder may not be assigned by any party hereto without the prior written consent of the other parties hereto, except that Buyer may make such assignments to any Affiliate of Buyer provided that Buyer remains liable hereunder.   This Agreement shall be governed by and construed in accordance with the laws of the Province of Saskatchewan and of Canada applicable therein without regard to its conflict of law doctrines.

**8.6**        **Amendment and Waiver; Cumulative Effect.**   To be effective, any amendment or waiver under this Agreement must be in writing and be signed by the party against whom enforcement of the same is sought.   Neither the failure of any party hereto to exercise any right, power or remedy provided under this Agreement or to insist upon compliance by any other party with its obligations hereunder, nor any custom or practice of the parties at variance with the

terms hereof shall constitute a waiver by such party of its right to exercise any such right, power or remedy or to demand such compliance. Except for rights to money damages which are covered in Article 7, the rights and remedies of the parties hereto are cumulative and not exclusive of the rights and remedies that they otherwise might have now or hereafter, at law, in equity, by statute or otherwise.

**8.7**     <u>**Entire Agreement; No Third Party Beneficiaries**</u>.  This Agreement and the Schedules and Exhibits set forth all of the promises, covenants, agreements, conditions and undertakings between the parties hereto with respect to the subject matter hereof, and supersede all prior or contemporaneous agreements and understandings, negotiations, inducements or conditions, express or implied, oral or written. This Agreement is not intended to confer upon any Person other than the parties hereto any rights or remedies hereunder, except the provisions of <u>Sections 7.2 and 7.3</u> relating to Buyer Indemnitees and Seller Indemnitees.

**8.8**     <u>**Severability**</u>.  If any term or other provision of this Agreement is held by a court of competent jurisdiction to be invalid, illegal or incapable of being enforced under any rule of Law in any particular respect or under any particular circumstances, such term or provision shall nevertheless remain in full force and effect in all other respects and under all other circumstances, and all other terms, conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner to the end that the transactions contemplated hereby are fulfilled to the fullest extent possible.

**8.9**     <u>**Counterparts**</u>.  This Agreement may be executed in two or more counterparts, each of which shall be deemed to be an original but all of which together shall be deemed to be one and the same instrument.

**8.10**     <u>**Legal Fees**</u>.  If either party commences or is made a party to an action or proceeding to enforce or interpret this Agreement, the prevailing party in such action or proceeding shall be entitled to recover from the other party all legal fees, costs and expenses (including any Taxes imposed on such fees, costs and expenses) incurred in connection with such action or proceeding or any appeal or enforcement of any judgment obtained in any such action or proceeding.

**8.11**     <u>**Retractable Share Documents**</u>.  In the event that Retractable Shares are delivered pursuant to section 2.5 then USF, Buyer and Industria Capital Inc. shall enter into a Voting Rights Agreement, a Support Agreement and a Share Exchange Agreement substantially in the form set out in Exhibits 2, 3 and 4 hereto and a Voting Agreement with respect to the Retractable Shares pursuant to which Industria Capital Inc. will agree to vote its shares as requested by USF.

**IN WITNESS WHEREOF,** the parties hereto have executed this Agreement as of the day and year first above written.

Arva Investments Limited

By: _____

Its: _____

Industria Capital Inc.

By: _____

Its: _PRESIDENT_ _____

Ron Greschner Enterprises Inc.

By: _____

Its: _____

_____
Will Slobodian

_____
Dwight G. Auramenko

_____
Norm Reise

GRESCHNER743

- 45 -

1258010 Ontario Inc.

By: _____

Its: _____President_____


United States Filter Corporation

By: _____

Its: __for Vice President__

# EXHIBIT I

## RETRACTABLE SHARE CONDITIONS

The Retractable Shares shall have attached thereto the following rights, privileges, restrictions and conditions:

**1.**      **Definitions**

1.1      The following words and phrases shall have the following meanings:

(a)    "Act" means the *Business Corporations Act (Ontario)*, as amended from time to time;

(b)    "Business Day" means a day other than a Saturday, Sunday or any other day treated as a holiday in the municipality in Ontario in which the Corporation's registered office is then situated or in the municipality in the United States in which USF's principal executive offices are then situated;

(c)    "Canadian Dollar Equivalent of the Current Market Price" Canadian Dollar Equivalent as applied to Current Market Price where such Price is quoted in U.S.$ means the Canadian dollar equivalent of such Price calculated by using the noon rate of exchange of the Bank of Canada on the day the Current Market Price is calculated;

(d)    "Current Market Price" when related to USF Common Stock means the closing price of such stock in US Dollars on the New York Stock Exchange in the last trading day before that day;

(e)    "holder" in respect of any Retractable Share means the registered holder thereof;

(f)    "Liquidation Amount" has the meaning ascribed thereto in section 3.1;

(g)    "Liquidation Date" has the meaning ascribed thereto in Section 3.1;

(h)    "Retracted Shares" has the meaning ascribed thereto in section 5.1;

(i)    "Retraction Price" has the meaning ascribed thereto in section 5.1;

GRESCHNER 745

- 2 -

(j)     "Retraction Request" has the meaning ascribed thereto in section 5.1; and

(k)     "Specified Number of Shares" means one share, subject to adjustment in accordance with Article 7.

(l)     "USF" means United States Filter Corporation, a corporation incorporated under the laws of Delaware;

(m)     "USF Common Stock" means the common stock of United States Filter Corporation with a par value of US$.01 per share;

(n)     "USF Dividend Declaration Date" means the date on which the board of directors of USF declares any dividend to be payable on the USF Common Stock;

1.2      If any day on which any dividend on the Retractable Shares is payable on or by which any other action is required to be taken hereunder is not a Business Day, then such dividends shall be payable or such other action shall be required to be taken on the next succeeding day that is a Business Day.

**2.      Dividends**

2.1      The holder of a Retractable Share shall be entitled to receive on each USF Dividend Declaration Date, a dividend on each Retractable Share:

(a)     in the case of a cash dividend declared on the USF Common Stock, in an amount in cash for each Retractable Share equal to the Canadian Dollar Equivalent on the USF Dividend Declaration Date of the cash dividend declared on the Specified Number of Shares of USF Common Stock; or

(b)     in the case of a stock dividend declared on the USF Common Stock to be paid in USF Common Stock, in such number of Retractable Shares for each Retractable Share as is equal to the number of shares of USF Common Stock to be paid on the Specified Number of Shares of USF Common Stock; or

- 3 -

(c)    in the case of a dividend declared on the USF Common Stock in property other than cash or USF Common Stock, in such type and amount of property for each Retractable Share as is the same as or economically equivalent to (to be determined by the board of directors, in good faith and its sole discretion, with the assistance of such reputable and independent financial advisors and/or other experts as the board may require) the type and amount of property declared on the Specified Number of Shares of USF Common Stock.  Such dividends shall be paid out of money, assets or property of the Corporation properly applicable to the payment of dividends, or out of authorized, but unissued shares of the Corporation.

2.2    The record date for the determination of the holders of Retractable Shares entitled to receive payment of, and the payment date for, any dividend declared on the Retractable Shares under section 2.1 shall be the same dates as the record date and payment date, respectively, for the corresponding dividend declared on the USF Common Stock.

## 3.    Dissolution

3.1    In the event of the liquidation, dissolution or winding-up of the Corporation, whether voluntary or involuntary, or any other distribution of assets of the Corporation among its shareholders for the purpose of winding-up its affairs, the holders of the Retractable Shares shall be entitled to receive from the assets and property of the Corporation in respect of each Retractable Share held by such holder on the effective date of such liquidation, dissolution or winding-up (the "Liquidation Date") an amount per share equal to (a) the Canadian Dollar Equivalent of the Current Market Price of the Specified Number of Shares of USF Common Stock on the last Business Day prior to the Liquidation Date which amount shall be paid and satisfied in full by the Corporation causing to be delivered to such holder the Specified Number of Shares of USF Common Stock plus (b) the amount by which the declared and unpaid dividends on one Retractable Share exceeds, if at all, the declared and unpaid dividends on the Specified Number of Shares of USF Common Stock (calculated as of the date of the declaration of such dividend or dividends in accordance with the provisions of these share conditions (collectively, the "Liquidation Amount") before any amount shall be paid or any assets or property of the Corporation distributed to the holders of Common Shares.

GRESCHNER747

- 4 -

3.2        In paying the Liquidation Amount the Corporation shall not be required to deliver fractional shares of USF Common Stock but in lieu thereof may pay to the holders of Retractable Shares an amount in cash equal to the same fraction of the Current Market Price of one share of USF Common Stock on the last Business Day prior to the Liquidation Date.

## 4.        Voting Rights

4.1        The holders of Retractable Shares shall be entitled to one vote for each Retractable Share held, provied that, if such Share is subject to a voting agreement in accordance with section 108 of the Act, which Agreement the holder has advised the Corporation of, then such holder shall not be entitled to receive notice of any meeting of shareholders or to attend any such meeting.

## 5.        Retraction Right at the Option of the Holders of Retractable Shares

5.1        The holders of Retractable Shares may, at their option and in the manner hereinafter provided, require the Corporation to redeem Retractable Shares registered in the name of such holder for an amount per share equal to (a) the Canadian Dollar Equivalent of the Current Market Price of the Specified Number of Shares of USF Common Stock on the last Business Day prior to the Retraction Date, which shall be satisfied in full by the Corporation causing to be delivered to such holder the Specified Number of Shares of USF Common Stock for each Retractable Share presented and surrendered by the holder, plus (b) the amount by which the declared and unpaid dividends on one Retractable Share exceeds, if at all, the declared and unpaid dividends on the Specified Number of Shares of USF Common Stock (calculated as of the date of the declaration of such dividend or dividends in accordance with the provisions of these share conditions) (collectively, the "Retraction Price", provided that if the record date for any such declared and unpaid dividends occurs on or after the Retraction Date the Retraction Price shall not include such additional amount equivalent to the declared and unpaid dividends). To effect such redemption, the holder shall present and surrender at the registered office of the Corporation or at such other locations as may be specified by the Corporation by notice to the holders of Retractable Shares, the certificate or certificates representing the Retractable Shares which the holder desires to have the Corporation redeem, together with such other documents and instruments as may be required to effect a transfer of Retractable Shares under the Act and the by-laws of the Corporation and such additional documents and instruments as the Corporation may reasonably require, including without limitation a certificate that such holder is not a non-resident of Canada within

GRESCHNER 748

- 5 -

the meaning of the *Income Tax Act* (Canada) or failing such certificate a certificate pursuant to section 116 of the *Income Tax Act* (Canada) on form and substance satisfactory to the Corporation, and together with the duly executed statement (the "Retraction Request") in a form specified by the board of directors or in such other form as may be acceptable to the Corporation:

   (a)   specifying that the holder desires to have all or any number specified therein of the Retractable Shares represented by such certificate or certificates (the "Retracted Shares") redeemed by the Corporation;

   (b)   stating the Business Day on which the holder desires to have the Corporation redeem the Retracted Shares (the "Retraction Date"), provided that the Retraction Date shall be not less than 10 Business Days nor more than 15 Business Days after the date on which the Retraction Request is received by the Corporation and further provided that, in the event that no such Business Day is specified by the holder in the Retraction Request, the Retraction Date shall be deemed to be the 15th Business Day after the date on which the Retraction Request is received by the Corporation.

5.2      Subject to section 5.6, upon receipt by the Corporation in the manner specified in section 5.1 hereof of a certificate or certificates representing the number of Retractable Shares which the holder desires to have the Corporation redeem, together with a Retraction Request, the Corporation shall redeem the Retracted Shares effective at the close of business on the Retraction Date and shall cause to be delivered to such holder the total Retraction Price with respect to such shares in the manner provided in section 5.4 (less any tax required to be deducted or withheld therefrom by the Corporation).

5.3      Upon receipt by the Corporation of a Retraction Request, the Corporation shall immediately notify USF thereof.

5.4      The Corporation shall deliver to the holder Retractable Shares at the address of the holder recorded in the securities register of the Corporation for the Retractable Shares or at the address specified in the holder's Retraction Request or by holding for pick-up by the holder at the registered office of the Corporation, certificates representing the shares of USF Common Stock (which shares shall be duly issued as fully-paid and non-assessable and shall be free and clear of any lien, claim or encumbrance, registered in the name of the holder or in such other name as the holder may require in payment of the total Retraction Price (less any tax required to

GRESCHNER 749

- 6 -

be deducted and withheld therefrom by the Corporation) and a cheque of the Corporation payable at par at any branch of the bankers of the Corporation in payment of the remaining portion, if any, of the total Retraction Price (less any tax required to be deducted and withheld therefrom by the Corporation) and such delivery of such certificates and cheque by the Corporation shall be deemed to be payment of and shall satisfy and discharge all liability for the total Retraction Price to the extent that the same is represented by such certificates and cheque (plus any tax required and in fact deducted and withheld therefrom and remitted to the proper tax authority), unless such cheque is not paid on due presentation.

5.5      In paying the Retraction Price the Corporation shall not be required to deliver fractional shares of USF Common Stock but in lieu thereof may pay to the holders of Retractable Shares in accordance with section 6.4 of this Part B an amount in cash equal to the same fraction of the Current Market Price of one share of USF Common Stock on the last Business Day prior to the Retraction Date.

5.6      A Retraction Request may be withdrawn at any time prior to the Retraction Date, in which case the Retracted Shares shall be returned to the registered holder or the authorized transferee of the registered holder.

**6.      No Dissent Rights**

6.1      A holder of Retractable Shares shall not be entitled to exercise any rights of dissent provided for in the Act on a proposal to amend the Articles of the Corporation to (a) effect an exchange, reclassification or cancellation of the Retractable Shares or (b) create a new class or series of shares equal or superior to the Retractable Shares.

**7.      Adjustment to the Specified Number of Shares**

7.1      If and whenever at any time up to and including the Liquidation Date, any action shall be taken affecting or relating to the shares of USF Common Stock, which in the opinion of the board of directors of the Corporation would prejudicially affect the rights of the holders of Retractable Shares, then the Specified Number of Shares shall be adjusted in such manner, if any, and at such time, as the board of directors of the Corporation may determine in their sole discretion to be equitable in the circumstances to the holders of Retractable Shares.  Any such determination shall be binding upon the Corporation, USF and each holder of Retractable Shares.  The

- 7 -

failure by the directors of the Corporation to take any action to provide for an adjustment on or prior to the effective date of any action by USF affecting the shares of USF Common Stock shall be conclusive evidence that the board of directors has determined that it is equitable to make no adjustment in the circumstances.

7.2        No adjustment in the Specified Number of Shares shall be required unless such adjustment would require an increase or decrease of at least one per cent in such number; provided, however, that any adjustments which by reason of this section 7.2 are not required to be made shall be carried forward and taken into account in any subsequent adjustment.   The adjustments provided for in this Article shall be cumulative.

## 8.        Transfer Restriction

8.1        The Retractable Shares are not transferrable without the prior written consent of USF.

GRESCHNER751

## EXHIBIT 2

## VOTING RIGHTS AGREEMENT

VOTING RIGHTS AGREEMENT, dated as of September 30, 1997 (this "Agreement"), by and among **United States Filter Corporation**, a Delaware corporation ("USF"), ● an Ontario Corporation and subsidiary of USF ("Newco"), **Industria Capital Inc** and **Ron Greschner Enterprises Ltd.,** Saskatchewan corporations (collectively such entities are referred to herein as the "Sellers"), and **Maitland Trustees Limited,** a trust company incorporated under the laws of the British Virgin Islands (the "Trustee").

## WITNESSETH

WHEREAS, the Sellers are former shareholders of WaterGroup Companies Inc., an Ontario corporation ("WCI");

AND WHEREAS, pursuant to a Share Purchase Agreement entered into among USF, Newco, WCI and the Sellers, *inter alia*, dated as of the date hereof (the "Purchase Agreement"), the parties thereto have agreed, subject to the terms and conditions set forth therein, that Newco shall acquire from the Sellers all of their issued and outstanding shares of WCI, and the Sellers shall receive Retractable Shares of Newco (the "Retractable Shares");

AND WHEREAS, USF desires to provide voting rights in USF to each holder (other than USF or its Subsidiaries) from time to time (collectively, the "Holders") of the Retractable Shares;

AND WHEREAS, the parties to this Agreement desire to establish a procedure whereby voting rights in USF shall be exercisable by the Holders by and through a trustee which will hold legal title to the common shares ("USF Shares") in the capital stock of USF to which voting rights attach for the benefit of the Holders;

AND WHEREAS, the foregoing statements of fact and recitals are made by the parties hereto except the Trustee;

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements herein contained, the parties agree as follows:

GRESCHNER 752

# ARTICLE 1

## VOTING SHARE

**1.1**     **Establishment of Trust**.  The purpose of this Agreement is to create the Trust to hold the USF Shares on behalf of the Holders and USF or its nominee and to enable the Trustee to exercise the voting rights attaching to the USF Shares for and on behalf of the Holders and the Clerk as provided in this Agreement while the entire beneficial interest in economic rights attaching to the USF Shares shall be vested in USF or its nominee.

**1.2**     **Issue and Ownership of the USF Shares**.  USF hereby issues to and deposits with the Trustee the USF Shares to be hereafter held of record by the Trustee as trustee for and on behalf of, and for the use and benefit of USF or its nominee as to all of the rights and entitlements with respect to the USF Shares other than the voting rights and, as to the voting rights only, for the use and benefit of the Holders and in accordance with the provisions of this Agreement.  USF hereby acknowledges receipt from the Trustee as trustee for and on behalf of itself and the Holders of good and valuable consideration (and the adequacy thereof) for the issuance of the USF Shares by USF to the Trustee.  During the term of the Trust and subject to the terms and conditions of this Agreement, the Trustee shall possess and be vested with full legal ownership of the USF Shares and shall be entitled to exercise all of the rights and powers of an owner with respect to the USF Shares, provided that the Trustee shall:  (a) hold the USF Shares and the legal title thereto as trustee solely for the use and benefit of USF or its nominee in accordance with the provisions of this Agreement; (b) except as specifically authorized by this Agreement have no power or authority to sell, transfer, vote, pledge, grant a security interest in or otherwise deal in or with the USF Shares and the USF Shares shall not be used or disposed of by the Trustee for any purpose other than the purposes for which this Trust is created pursuant to this Agreement, and (c) vote the USF Shares at the direction of the Holders as provided in this agreement.

**1.3**     **Legended Share Certificates**.  Newco will cause each certificate representing Retractable Shares to bear an appropriate legend notifying the Holders of the existence of this Agreement and indicating that the holders of the Retractable Shares are entitled to certain benefits and are subject to certain restrictions as contained in this Agreement and in the Share Exchange Agreement between the parties hereto dated September 30, 1997 (the "Share Exchange Agreement").

**1.4**     **Safe Keeping of Certificate**.  The certificates representing the USF Shares shall at all times be held in safe keeping by the Trustee.

## ARTICLE 2

## VOTING OF USF Shares

**2.1**        **USF Shares.**  The Trustee, as the holder of record of the USF Shares, shall be entitled to all of the Voting Rights (as hereinafter defined), including the right to consent to or to vote in person or by proxy the USF Shares on any matter, question or proposition whatsoever that may properly come before the shareholders of USF at a USF Meeting or in connection with a USF Consent (in each case, as hereinafter defined).  The Voting Rights shall be and remain vested in and exercised by the Trustee.  Subject to Section 4.10 hereof, the Trustee shall exercise the Voting Rights only:  (a) on the basis of written instructions received pursuant to this Article 2 from Holders entitled to instruct the Trustee as to the voting thereof (or from the Clerk pursuant to Section 2.3) at the time at which the USF Consent is effective or the USF Meeting is held or (b) to the extent that no instructions are received from a Holder with respect to the Voting Rights to which such Holder is entitled, the Trustee shall not exercise or permit the exercise of such Voting Rights.

**2.2**        **Number and Entitlement to Vote.**  Each Holder shall be entitled to instruct the Trustee in writing at or prior to or in respect of, as the case may be:

   2.2.1   any annual or special meeting of shareholders of USF, or of any class or series of shareholders of USF, at which the holder of the USF Shares shall be entitled to vote (a "USF Meeting"); and

   2.2.2   any action taken without a meeting by written consent of shareholders of USF, or of any class or series of shareholders of USF, at which the holder of the USF Shares shall be entitled to act (a "USF Consent");

as to the exercise of that number of the aggregate of the votes attached to the USF Shares as equals the product obtained by multiplying the number of votes attached to the Specified Number of Shares (as such term is defined in Newco's Articles) of USF common stock on the date determined by USF or by applicable law as the record date for determining shareholders entitled to vote at the USF Meeting at which the vote is to be taken or on the date on which the Trustee executes a written consent to an action taken by USF Consent, as the case may be, by the number of Retractable Shares owned of record by such Holder on such record date or the date upon which the written consent is executed, as applicable (the "Voting Rights"), provided, however, that in no event shall the aggregate number of votes for such Holders pursuant to this Section exceed the aggregate of the votes attached to the USF Shares held by the Trustee.

**2.3**        **Mailings to Shareholders.**  With respect to each USF Meeting and USF Consent, the Trustee will mail or cause to be mailed (or otherwise communicate in the same manner as USF utilizes in communications to holders of shares of USF common stock) to each of the Holders on the same day as the initial mailing or notice (or other communication) with respect thereto is given by USF to its shareholders:

GRESCHNER 754

(a) a copy of such notice, together with any related materials to be provided to shareholders of USF;

(b) a statement that such Holder is entitled to instruct the Trustee as to the exercise of the Voting Rights to which such Holder is entitled with respect to such USF Meeting or USF Consent, as the case may be, or, pursuant to Section 2.8, to attend such USF Meeting and to exercise personally such Voting Rights thereat;

(c) a statement as to the manner in which such instructions may be given to the Trustee (and the method for revoking the same), including an express indication that instructions may be given to the Trustee to give:

    (i) a proxy to such Holder or his designee to exercise personally the Voting Rights to which such Holder is entitled; or

    (ii) a proxy to a designated agent or other representative of the management of USF to exercise such Voting Rights;

(d) a statement that if no such instructions are received from the Holder, the Voting Rights to which such Holder is entitled will not be exercised;

(e) a form of direction whereby the Holder may so direct and instruct the Trustee as contemplated herein; and

(f) a statement of the time and date by which such instructions must be received by the Trustee in order to be binding upon it, which in the case of a USF Meeting shall not be earlier than the close of business on the second Business Day prior to such meeting, and of the method for revoking or amending such instructions.

USF will notify the Trustee of any decision of USF with respect to the calling of any such USF Meeting or the seeking of any such USF Consent and shall provide all necessary information and materials to the Trustee in each case promptly and in any event in sufficient time to enable the Trustee to perform its obligations contemplated by this Section 2.3.

**2.4**      **Copies of Shareholder Information.** USF will deliver to the Trustee copies of all proxy materials, information statements, reports (including all interim and annual financial statements) and other written communications that are to be distributed from time to time to holders of shares of USF common stock in sufficient quantities and in sufficient time so as to enable the Trustee to send those materials to each Holder at the same time as such materials are first sent to holders of shares of USF common stock. The Trustee will mail or otherwise send to each Holder, copies of all such materials (and all materials specifically directed to the Holders or to the Trustee for the benefit of the Holders by USF) received by the Trustee from USF at the same time as such materials are first sent to holders of shares of USF common stock. The Trustee will also make available for inspection by any Holder at

GRESCHNER 755

the Trustee's principal corporate trust office in the city of Toronto, Ontario all proxy materials, information statements, reports and other written communications that are:

    (a)    received by the Trustee as the registered holder of the USF Shares and made available by USF to the holders of shares of USF common stock; or

    (b)    specifically directed to the Holders or to the Trustee for the benefit of the Holders by USF.

**2.5**    **Other Materials**.  Immediately after receipt by USF or any shareholder of USF of any material sent or given to the holders of shares of USF common stock by or on behalf of a third party, including without limitation dissident proxy and information circulars (and related information and material) and tender and exchange offer circulars (and related information and material), USF shall use its best efforts to obtain and deliver to the Trustee copies thereof in sufficient quantities so as to enable the Trustee to forward such materials (unless the same has been provided directly to the Holders by such third party) to each Holder as soon as practical thereafter.  Immediately upon receipt thereof, the Trustee will mail or otherwise send to each Holder, copies of all such materials received by the Trustee from USF.  The Trustee will also make available for inspection by any Holder at the Trustee's principal corporate trust office in the British Virgin Islands, copies of all such materials.

**2.6**    **Persons Entitled to Vote**.  Newco shall (a) prior to each annual, general and special USF Meeting or the seeking of any USF Consent and (b) forthwith upon each request made at any time by the Trustee to Newco in writing, advise the Trustee in writing of the number of Retractable Shares held on record by each Holder and the Specified Number of Shares per Retractable Shares.  USF agrees to give Newco and the Trustee notice in writing of the calling of any USF Meeting or the seeking of any USF Consent, together with the record dates therefor, sufficiently prior to the date of the calling of such meeting or seeking of such consent so as to enable Newco and the Trustee to perform their obligations under this Section 2.6.

**2.7**    **Voting by Trustee**.  In connection with each USF Meeting and USF Consent, the Trustee shall exercise, either in person or by proxy, in accordance with the instructions received from a Holder pursuant to Section 2.2, the Voting Rights as to which such Holder is entitled to direct the vote (or any lesser number thereof as may be set forth in the instructions).

**2.8**    **Attendance of Trustee Representation at Meeting**.  The Trustee shall cause a representative who is empowered by it to sign and deliver, on behalf of the Trustee, proxies for Voting Rights to attend each USF Meeting.  Upon submission by a Holder (or his designee) of identification satisfactory to the Trustee's representative, and at the Holder's request, such representative shall sign and deliver to such Holder (or his designee) a proxy to exercise personally the Voting Rights as to which such Holder is otherwise entitled hereunder to direct the vote, if such Holder either (a) has not previously given the Trustee instructions pursuant to Section 2.2 in respect of such meeting, or (b) submits to such representative

GRESCHNER 756

written revocation of any such previous instructions. At such USF Meeting, a Holder exercising personally such Holder's Voting Rights shall have the same rights as the Trustee to speak at the USF Meeting in respect of any matter, question or proposition, to vote by way of ballot at the USF Meeting in respect of any manner, question or proposition and to vote at the USF Meeting by way of a show of hands in respect of any matter, question or proposition.

**2.9        Distribution of Written Materials.** Any written materials distributed by the Trustee pursuant to this Agreement shall be sent by mail (or otherwise communicated in the same manner as USF utilizes in communications to holders of shares of USF common stock) to each Holder at its address as shown on the books of Newco. Newco shall provide or cause to be provided to the Trustee for this purpose, on a timely basis and without charge or other expense: (a) current lists of the Holders; and (b) upon the request of the Trustee, mailing labels to enable the Trustee to carry out its duties under this Agreement.

**2.10        Termination of Voting Rights.** All of the rights of a Holder with respect to the Voting Rights exercisable in respect of the Retractable Shares held by such Holder, including the right to instruct the Trustee as to the voting of or to vote personally such Voting Rights, shall be deemed to be surrendered by the Holder to USF and such Voting Rights represented thereby shall cease immediately upon the effectiveness of a Share Exchange with respect to such Retractable Shares.

**2.11        Transfer of USF Share.** The Trustee acknowledges and agrees that it will transfer to USF or its nominee that number of USF Shares equal to the Specified Number of Shares per Retractable Shares upon receiving notice from USF that USF or its nominee is to acquire a Retractable Share or that Newco will redeem a Retractable Share.

## ARTICLE 3

## CONCERNING THE TRUSTEE

**3.1        Powers and Duties of the Trustee.** The rights, powers, duties and authorities of the Trustee under this Agreement, in its capacity as trustee of the Trust, shall include:

(a)        acquiring the USF Shares from USF as trustee for and on behalf of the beneficiaries in accordance with the provisions of this Agreement;

(b)        granting proxies and distributing materials to Holders as provided in this Agreement;

(c)        voting the USF Shares in accordance with the provisions of this Agreement;

(d)        taking action on its own initiative or at the direction of a Holder or Holders to enforce the obligations of USF under this Agreement; and

GRESCHNER 757

(e)    taking such other actions and doing such other things as are specifically provided in this Agreement.

In the exercise of such rights, powers, duties and authorities the Trustee shall have (and is granted) such incidental and additional rights, powers, duties and authorities not in conflict with any of the provisions of this Agreement as the Trustee acting in good faith and in the reasonable exercise of its discretion, may deem necessary, appropriate or desirable to effect the purpose of the Trust. Any exercise of such discretionary rights, powers, duties and authorities by the Trustee shall be final, conclusive and binding upon all persons.

The Trustee in exercising its rights, powers, duties and authorities hereunder shall act honestly and in good faith with a view to the best interests of Newco, USF and the Holders and shall exercise the care, skill and diligence that a reasonably prudent trustee would exercise in comparable circumstances.

**3.2    No Conflict of Interest.** The Trustee represents to Newco, USF and the Sellers that at the date of execution and delivery of this Agreement there exists no material conflict of interest in the role of the Trustee as a fiduciary hereunder and the role of the Trustee in any other capacity. The Trustee shall, within 90 days after it becomes aware that such a material conflict of interest exists, either eliminate such material conflict of interest or resign in the manner and with the effect specified in Article 6. If, notwithstanding the foregoing provisions of this Section 3.2, the Trustee has such a material conflict of interest, the validity and enforceability of this Agreement shall not be affected in any manner whatsoever by reason only of the existence of such material conflict of interest. If the Trustee contravenes the foregoing provisions of this Section 3.2, then in addition to any other action available to a party hereunder, any interested party may apply to the appropriate Court of the British Virgin Islands for an order that the Trustee be replaced as trustee hereunder.

**3.3    Dealings with Transfer Agents, Registrars, etc.** USF irrevocably authorizes the Trustee, from time to time, to consult, communicate and otherwise deal with its registrar and transfer agent, and with any such subsequent registrar or transfer agent, of Shares of USF common stock and requisition, from time to time from any such registrar or transfer agent any information readily available from the records maintained by it which the Trustee may reasonably require for the discharge of its duties and responsibilities under this Agreement. USF irrevocably authorizes its respective registrar and transfer agent to comply with all such requests.

**3.4    Books and Records.** The Trustee shall keep available for inspection by the Sellers, Newco and USF, at the Trustee's principal corporate trust office in the British Virgin Islands, correct and complete books and records of account relating to the Trust created by this Agreement, including without limitation all data relating to mailings and inspections to and from Holders.

**3.5    Reliance Upon Declarations.** The Trustee shall not be considered to be in contravention of any of its rights, powers, duties and authorities hereunder if, when required, it acts and relies in good faith upon statutory declarations, certificates, opinions or reports

GRESCHNER758

furnished pursuant to the provisions hereof or required by the Trustee to be furnished to it in the exercise of its rights, powers, duties and authorities hereunder if such statutory declarations, certificates, opinions or reports comply with the provisions of Section 4.6 hereof, if applicable, and with any other applicable provisions of this Agreement.

3.6     **Trustee Not Required to Give Security**.  The Trustee shall not be required to give any bond or security in respect of the execution of the trusts, rights, duties, powers and authorities of this Agreement or otherwise in respect of the premises.

3.7     **Authority to Carry on Business**.  The Trustee represents to the Sellers, Newco and USF that at the date of execution and delivery by it of this Agreement it is authorized to carry on the business of a Trustee in the British Virgin Islands but if, notwithstanding the provisions of this Section 3.7, it ceases to be so authorized to carry on business, the validity and enforceability of this Agreement and the Voting Rights shall not be affected in any manner whatsoever by reason only of such event but the Trustee shall, within 90 days after ceasing to be authorized to carry on the business of a Trustee either become so authorized or resign in the manner and with the effect specified in Article 6.

3.8     **Acceptance of Trust**.  The Trustee hereby accepts the Trust created and provided for by and in this Agreement and agrees to perform the same upon the terms and conditions herein set forth and to hold all rights, privileges and benefits conferred hereby and by law in trust for the various persons who shall from time to time be Holders, subject to all the terms and conditions herein set forth.

## ARTICLE 4

## COMPENSATION

4.1     **Fees and Expenses of the Trustee**.  The Sellers jointly and severally agree to pay to the Trustee compensation for all of the services rendered by it under this Agreement as agreed upon hereunder and will reimburse the Trustee for all reasonable expenses and disbursements, including the cost and expense of any suit or litigation of any character and any proceedings before any governmental agency reasonably incurred by the Trustee in connection with its duties under this Agreement; <u>provided</u> that the Sellers shall have no obligation to reimburse the Trustee for any expenses or disbursements paid, incurred or suffered by the Trustee in any suit or litigation in which the Trustee is determined to have acted in bad faith or with negligence or wilful misconduct.

# ARTICLE 5

# INDEMNIFICATION AND LIMITATION OF LIABILITY

5.1        **Indemnification of the Trustee**.  The Sellers jointly and severally agree to indemnify and hold harmless the Trustee and each of its directors, officers and agents appointed and acting in accordance with this Agreement (collectively, the "Indemnified Parties") against all claims, liabilities, losses, damages, costs, penalties, fines and reasonable expenses (including reasonable expenses of the Trustee's legal counsel) which, without fraud, negligence, wilful misconduct or bad faith on the part of such Indemnified Party, may be paid, incurred or suffered by the Indemnified Party by reason of or as a result of the Trustee's acceptance or administration of the Trust, its compliance with its duties set forth in this Agreement, or any written or oral instructions delivered to the Trustee by Newco or USF pursuant hereto.  In no case shall Newco or USF be liable under this indemnity for any claim against any of the Indemnified Parties.  Subject to clause (b) below, the Sellers shall be entitled to participate at their own expense in the defense and, if the Sellers so elect at any time after receipt of such notice, either of them may assume the defense of any suit brought to enforce any such claim.  The Trustee shall have the right to employ separate counsel in any such suit and participate in the defense thereof but the fees and expenses of such counsel shall be at the expense of the Trustee unless:  (a) the employment of such counsel has been authorized by the Sellers or (b) the counsel retained by the Sellers would be inappropriate due to actual or potential different interests between the Trustee and any other party represented by such counsel retained by the Sellers in such a proceeding (in which case the Sellers shall not have the right to assume the defense of such suit on behalf of the Trustee but shall be liable to pay the reasonable fees and expenses of counsel for the Trustee).

5.2        **Limitation of Liability**.  The Trustee shall not be held liable for any loss under this Agreement, except to the extent that such loss is attributable to the fraud, negligence, wilful misconduct or bad faith on the part of the Trustee.

5.3        **Express Duties**.  The Trustee shall have no duties or responsibilities except as expressly provided in this Agreement and shall have no liability or responsibility arising under any other agreement, including any agreement referred to in this Agreement, to which the Trustee is not a party.

# ARTICLE 6

# CHANGE OF TRUSTEE

6.1        **Resignation**.  The Trustee, or any trustee hereafter appointed, may at any time resign by giving written notice of such resignation to the Sellers, Newco and USF specifying the date on which it desires to resign, provided that such notice shall never be given less than one month before such desired resignation date and provided further that such resignation shall not take effect until the date of the appointment of a successor trustee,

GRESCHNER760

acceptable to the Sellers and USF.  Upon receiving such notice of resignation, Sellers shall promptly appoint a successor trustee by written instrument in duplicate, one copy of which shall be delivered to the resigning trustee and one copy to the successor trustee.  Failing such appointment, the retiring Trustee at the Sellers expense may apply to the appropriate Court of the British Virgin Islands for the appointment of a new Trustee.

6.2        **Removal**.  The Trustee, or any trustee hereafter appointed, may be removed at any time on 30 days' prior notice by written instrument executed by Sellers, in duplicate, one copy of which shall be delivered to the trustee so removed and one copy to the successor trustee, provided that such removal shall not take effect until such time as a successor trustee appointed in accordance with Section 6.3 has accepted such appointment.

6.3        **Merger of Trustee**.  In the event the Trustee is merged, consolidated or amalgamated with any other entity, and as a result thereof the Trustee ceases to exist as a separate entity, then such surviving entity, without any further act, shall become fully vested with all the rights, immunities and powers, and shall be subject to all of the duties and obligations of the Trustee.

## ARTICLE 7

## AMENDMENTS

7.1        **Amendments, Modifications, etc.**  This Agreement may not be amended, modified or supplemented by the parties hereto in any manner, except by an instrument in writing signed by a duly authorized officer of Newco, USF, the Trustee and Holders.

7.2        **Changes in Capital of USF and Newco**.  At all times after the occurrence of any event in which either shares of USF common stock or the Retractable Shares or both are in any way changed, this Agreement shall forthwith be amended and modified as necessary in order that it shall apply with full force and effect, *mutatis mutandis*, to all new securities into which shares of USF common stock or the Retractable Shares or both are so changed and the parties hereto shall execute and deliver an agreement in writing giving effect to and evidencing such necessary amendments and modifications.

## ARTICLE 8

## TERMINATION

8.1        **Term**.  The Trust created thereby shall continue until the earliest to occur of the following events:

(a)        no Retractable Shares are held by a Holder;

(b)   the execution of an instrument in writing to terminate this Agreement signed on behalf of USF and Newco by their duly authorized officers or representatives of Newco and USF and approved by Sellers; and

(c)   21 years after the death of Her Majesty Queen Elizabeth the Second of the United Kingdom of Great Britain and Northern Ireland living on the date of this Agreement.

8.2       **Survival of Agreement.**  This Agreement shall survive any termination of the Trust and shall continue until there are no Retractable Shares outstanding held by a Holder; provided, however, that the provisions of Articles 5 and 6 shall survive any such termination of this Agreement.

## ARTICLE 9

## DEFINITIONS AND MISCELLANEOUS

9.1       **Definitions of Certain Terms.**  As used herein, the following terms shall have the meanings set out in this Agreement and as follows:

Business Day:  means a day other than a Saturday, Sunday or any other day treated as a holiday in the municipality in Canada in which Newco's registered office is then situated or in Boston, Massachusetts;

Officer's Certificate:  with respect to USF or Newco, as the case may be, a certificate signed by any one of the Chairman of the Board, the President, any Vice-President or any other senior officers of USF or Newco, as the case may be.

Subsidiary:  any corporation, association, or other business entity a majority (by number of votes on the election of directors) of the shares of capital stock (or other voting interests) of which is owned by USF or its Subsidiaries.

9.2       **No Waiver.**  The failure of any party hereto to enforce at any time any of the provisions of this Agreement shall in no way be construed to be a waiver of any such provision, nor in any way to affect the validity of this Agreement or any part hereof or the right of such party thereafter to enforce each and every such provision.  No waiver of any breach of or non-compliance with this Agreement shall be held to be a waiver of any other or subsequent breach or non-compliance.

9.3       **Governing Law.**  This Agreement shall be governed by and construed and enforced in accordance with the laws of the Province of Saskatchewan (and the laws of Canada applicable therein), without regard to their respective conflict of law rules.

GRESCHNER 762

**9.4**     **Entire Agreement, Assignability, etc.**  This Agreement (a) constitutes the entire agreement, and supersedes all other prior agreements and understandings, both written and oral between the parties with respect to the subject matter hereof, (b) is not intended to confer upon any person other than the parties hereto any rights or remedies hereunder, except as otherwise expressly provided herein, and (c) shall not be assignable by operation of law or otherwise, except as otherwise expressly provided herein.

**9.5**     **Validity.**  The invalidity or unenforceability of any provisions of this Agreement shall not affect the validity of enforceability of any other provisions of this Agreement, each of which shall remain in full force and effect.

**9.6**     **Counterparts.**  This Agreement may be executed in one or more counterparts, all of which together shall constitute one and the same Agreement.

        **IN WITNESS WHEREOF,** the parties have duly executed this Agreement as of the date first above written.


**United States Filter Corporation**

By: _____
Name:
Title:


**Industria Capital Inc.**

By: _____
Name:
Title:


**Ron Greschner Enterprises Ltd.**

By: _____
Name:
Title:
By: _____


**Trustee**

By: _____

## EXHIBIT 3

## SUPPORT AGREEMENT

**SUPPORT AGREEMENT**, dated as of    ●    , 1997 (this "Agreement"), by and among **United States Filter Corporation** ("USF"), a Delaware corporation    ● ("Newco"), an Ontario corporation (the "Buyers") together with **Industria Capital Inc.,** a Saskatchewan corporation and **Ron Greschner Enterprises Ltd.,** a Saskatchewan corporation (the "Sellers").

## WITNESSETH

WHEREAS pursuant to a Share Purchase Agreement, dated as of September 30, 1997 to which Newco, USF and the Sellers are parties (the "Purchase Agreement"), subject to the terms and conditions set forth therein, Newco will acquire from the Sellers all of their issued and outstanding common shares of WaterGroup Companies Inc. ("WCI"), and the Sellers shall receive Retractable Shares of Newco (the "Retractable Shares");

AND WHEREAS Newco's Articles set forth the rights, privileges, restrictions and conditions attaching to the Retractable Shares;

AND WHEREAS USF or one of its direct or indirect wholly-owned subsidiaries will, following completion of the Purchase Agreement, be the registered and beneficial owner of all of the issued and outstanding common shares of Newco (the "Newco Common Shares");

AND WHEREAS the parties hereto desire to make appropriate provision and to establish a procedure whereby USF will take certain actions and make certain payments and deliveries necessary to ensure that Newco will be able to make certain payments and to deliver shares of common stock of USF, (the "USF common stock"), in satisfaction of the obligations of Newco with respect to the obligations to the Sellers in accordance with Newco's Retractable Shares;

NOW THEREFORE, in consideration of the premises and mutual covenants and agreements herein contained, the parties agree as follows:

## ARTICLE 1

## COVENANTS OF USF AND NEWCO

1.1    **Funding of Newco.**  So long as any Retractable Shares are outstanding, USF will:

(a)    not declare any dividend on shares of USF Common Stock unless Newco shall, on the same day (or if the same day is not a Business Day, the next succeeding day that is a Business Day) declare a dividend on the Retractable Shares as required by the Newco Articles;

(b)    advise Newco sufficiently in advance of the declaration by USF of any proposed dividend on shares of USF Common Stock and take all such other actions as are necessary, in cooperation with Newco, to ensure that the respective declaration date, record date and payment date for a dividend on the Retractable Shares shall be the same day (or if the same day is not a Business Day, then the next succeeding day that is a Business Day) as the declaration date, record date and payment date for the corresponding dividend on shares of USF Common Stock;

(c)    provide or cause to be provided to Newco, by any means which USF deems appropriate from time to time, such assets, funds and other property as may be necessary in order that Newco will have sufficient assets, funds and other property available to enable (i) the due declaration and the due and punctual payment, in accordance with applicable law, of all dividends on the Retractable Shares in accordance with Newco's Articles and (ii) the due performance by Newco of its obligations under this Agreement and the Newco Articles;

(d)    take all such actions and do all such things as are necessary or desirable to enable and permit Newco, in accordance with applicable law, to pay and otherwise perform its obligations with respect to the satisfaction of any amount payable in respect of each issued and outstanding Retractable Share whether upon redemption of the Retractable Shares, dissolution of Newco or other event.

**1.2    Segregation of Funds.**  Upon USF providing or causing to be provided to Newco any funds, assets or other property in accordance with Section 1. 1, Newco shall deposit such funds in a separate account and segregate such assets and other property, in each case for the benefit of holders from time to time of the Retractable Shares, and will use such funds, assets and other property exclusively for the payment of dividends and the payment or other satisfaction of all other amounts.

**1.3    Notification of Certain Events.**  In order to assist USF to comply with its obligations hereunder, Newco will give USF notice of each of the following events at the time set forth below:

(a)    in the event of any determination by the Board of Directors of Newco to institute voluntary liquidation, dissolution or winding-up proceedings with respect to Newco or to effect any other distribution of the assets of Newco among its shareholders for the purpose of winding-up its affairs, at least 60

days prior to the proposed effective date of such liquidation, dissolution, winding-up or other distribution;

(b)     immediately, upon the earlier of receipt by Newco of notice of or Newco otherwise becoming aware of any instituted claim, suit, petition or other proceedings with respect to the involuntary liquidation, dissolution or winding-up of Newco or to effect any other distribution of the assets of Newco among its shareholders for the purpose of winding-up its affairs; and

(c)     immediately, upon receipt by Newco of a Retraction Request.

**1.4     Tender Offers, Etc.**  In the event that a tender offer, share exchange offer, issuer bid, take-over bid or similar transaction with respect to shares of USF Common Stock (an "Offer") is proposed by USF or is proposed to USF or its shareholders and is recommended by the Board of Directors of USF, or is otherwise effected or to be effected with the consent or approval of the Board of Directors of USF, USF will use its commercially reasonable efforts expeditiously and in good faith to take all such actions and do all such things as are necessary or desirable to enable and permit holders of Retractable Shares to participate in such Offer to the same extent and on an economically equivalent basis as the holders of shares of USF Common Stock, without discrimination.

## ARTICLE 2

## GENERAL

**2.1     Term.**  This Agreement shall come into force and be effective as of the date hereof and shall terminate and be of no further force and effect at such time as no Retractable Shares (or securities or rights convertible into or exchangeable for or carrying rights to acquire Retractable Shares) are held by any party other than USF and any of its Subsidiaries.

**2.2     Changes in Capital of USF and Newco.**  At all times after the occurrence of any event in which either shares of USF common stock or the Retractable Shares or both are in any way changed, this Agreement shall forthwith be amended and modified as necessary in order that it shall apply with full force and effect, *mutatis mutandis*, to all new securities into which shares of USF common stock or the Retractable Shares or both are so changed and the parties hereto shall execute and deliver an agreement in writing giving effect to and evidencing such necessary amendments and modifications.

**2.3     Amendments and Supplements.**  This Agreement may not be amended, modified or supplemented by the parties hereto in any manner, except by an instrument in writing signed on behalf of USF and Newco by their duly authorized officers or representatives and by the holders of at least two thirds of the Retractable Shares.

**2.4     Governing Law.**  This Agreement shall be governed by and construed and enforced in accordance with the laws of the Province of Ontario.

2.5    **Notice.**  All notices and other communications hereunder shall be in writing and shall be deemed given if delivered by hand, sent by facsimile transmission with confirmation of receipt requested, sent via a reputable international courier service with confirmation of receipt requested, or mailed by registered or certified mail (postage prepaid and return receipt requested) to the parties at the following addresses (or at such other address for a party as shall be specified by like notice), and shall be deemed given on the date on which delivered by hand or otherwise on the date of receipt is confirmed:

        To USF or to Newco:

        Michael Hulme
        United States Filter Corporation
        40 - 004 Cook Street
        Palm Desert, California 92211
        U.S.A.

        With a copy to:

        Warren Grover
        Blake, Cassels & Graydon
        199 Bay Street,
        Toronto, Ontario
        Canada M5L 1A9

        To the Sellers:

        At their respective addresses appearing on the register as maintained by Newco with respect to the Retractable Shares

        With a copy to:

        MacPherson Leslie & Tyerman
        1500 - 1874 Scarth Street,
        Regina, Saskatchewan
        Canada
        S4P 4E9.

        Attention:  Robert Pletch

2.6    **Construction of Agreement.**  A reference to an Article or a Section shall mean an Article of or a Section in this Agreement unless otherwise expressly stated.  The titles and headings herein are for reference purposes only and shall not in any manner limit the construction of this Agreement which shall be considered as a whole.  The words "include," "includes" and "including" when used herein shall be deemed in each case to be followed by the words "without limitation."

**2.7    Entire Agreement, Assignability, etc.**  This Agreement together with other concurrent written documentation relating to the Retractable Shares constitutes the entire agreement, and supersedes all other prior agreements and understandings, both written and oral, between the parties with respect to the subject matter hereof.  This Agreement is not intended to confer upon any person other than the parties hereto and permitted transferees of the Retractable Shares any rights or remedies hereunder, except as otherwise expressly provided herein, and shall not be assignable by operation of law or otherwise, except to permitted transferees of Retractable Shares.

**2.8    Validity.**  The invalidity or unenforceability of any provisions of this Agreement shall not affect the validity or enforceability of any other provisions of this Agreement, each of which shall remain in full force and effect.

**2.9    Counterparts.**  This Agreement may be executed in one or more counterparts, all of which together shall constitute one and the same Agreement.

GRESCHNER 768

**IN WITNESS WHEREOF**, the parties have duly executed this Agreement as of the date first above written.

**UNITED STATES FILTER CORPORATION**

By: _____
Name:
Title:


●            **(Newco)**

By: _____
Name:
Title:


**Industria Capital Inc.**

By: _____
Name:
Title:


**Robert Greschner Enterprises Ltd.**

By: _____
Name:
Title:

**EXHIBIT 4**

**SHARE EXCHANGE AGREEMENT**

**SHARE EXCHANGE AGREEMENT**, dated as of September 30, 1997 (this "Agreement"), by and among **United States Filter Corporation** ("USF"), a corporation incorporated under the laws of Delaware, **Industria Capital Inc.**, a Saskatchewan Corporation and **Ron Greschner Enterprises Ltd.**, a Saskatchewan Corporation, collectively hereinafter referred to as the "Sellers").

**WITNESSETH**

WHEREAS, pursuant to a Share Purchase Agreement entered into among USF and the Sellers *inter alia*, dated as of the date hereof (the "Purchase Agreement"), the parties thereto have agreed, subject to the terms and conditions set forth therein, that a wholly-owned Canadian subsidiary of USF ("Newco") shall acquire from certain of the Sellers all of their issued and outstanding common shares of WaterGroup Companies Inc.. ("WCI"), and in exchange, the Sellers shall receive Retractable Shares of Newco (the "Retractable Shares");

AND WHEREAS, the Sellers as owners of the Retractable Shares (the "Holders"), desire to confirm their agreement to sell to USF and its nominee from time to time their Retractable Shares for shares of the common stock of USF (the "USF Common Stock");

AND WHEREAS, USF desires the right to purchase from time to time pursuant to the terms of this Agreement, the Holders' Retractable Shares;

AND WHEREAS some of the Retractable Shares owned by Seller are deposited with Blake, Cassels & Graydon pursuant to an Escrow Agreement (the "Escrow Agreement");

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements herein contained, the parties agree as follows:

**ARTICLE 1**

**DEFINITIONS**

**1.1.    Definitions.**  As used herein, the following terms shall have the following meanings and capitalized terms shall have the meanings also set forth herein:

"**Business Day**" means a day other than a Saturday, Sunday or any other day treated as a holiday in the municipality in Canada in which Newco's registered office is then situated or in the municipality in the United States in which USF's principal executive offices are then situated;

"**Share Exchange**" means any Retractable Shares, the acquisition by USF hereunder or under the Articles of Newco of such Retractable Shares, whether pursuant to the exercise by USF of the Liquidation Call right, the Retraction Call right, the Dividend Call Right or the Call Right;

"**Subsidiary**" means any corporation, association or other business entity a majority (by number of votes on the election of directors) of the shares of capital stock (or other voting interests) of which is owned by USF or its Subsidiaries.

## ARTICLE 2

## DISTRIBUTION ON LIQUIDATION OF NEWCO

**2.1    Liquidation Call Right.**  In the event of the liquidation, dissolution or winding-up of Newco, whether voluntary or involuntary, or any other distribution of assets of Newco among its shareholders for the purpose of winding-up its affairs, USF shall have the right (the "Liquidation Call Right") to purchase on the day before the effective date of such liquidation, dissolution or winding-up (the "Newco Liquidation Date") all of the Retractable Shares from all all of the Holders in exchange, on a per share basis, for (a) the Specified Number of Shares of USF Common Stock, which USF shall cause to be delivered to such Holder (less any taxes arising by reason of such purchase) plus (b) the amount by which the declared and unpaid dividends on one Retractable Share exceeds, if at all, the declared and unpaid dividends on the Specified Number of Shares of USF Common Stock (less any tax required to be deducted or withheld therefrom by USF the "Liquidation Call Price").

**2.2    Exercise of Liquidation Call Right.**  To exercise the Liquidation Call Right, USF will notify the Holders and Newco of its intention to exercise such right at least 10 days before the Newco Liquidation Date in the case of a voluntary liquidation, dissolution or winding-up of Newco and at least 5 Business Days before the Newco Liquidation Date in the case of an involuntary liquidation, dissolution or winding-up of Newco.  If USF exercises the Liquidation Call Right, on the Newco Liquidation Date USF will purchase and the Holders will sell all of the Retractable Shares then outstanding for a price per share equal to the Liquidation Call Price.

**2.3    Procedure for Payment of Liquidation Call Price.**  In the event USF has exercised the Liquidation Call Right as provided herein, then on the day before the Newco Liquidation Date, USF shall deliver or cause to be delivered to each Holder, the Liquidation Call Price for each such Newco, Retractable Share upon presentation and surrender at the registered office of USF (attention:  Chief Financial Officer), or at such other location as may be

specified by USF by notice to the Holders in such notice, of the certificates representing such Retractable Shares, together with one or more stock transfer powers endorsed in blank executed by such Holder and containing a representation and warranty by such Holder that the Holder is not a non-resident of Canada within the meaning of the *Income Tax Act* (Canada) and if such Holder does not so represent and warrant the provisions of Section 6.6 shall apply. Payment of the total Liquidation Call Price for such Retractable Shares shall be made by delivery to each Holder at the address of the Holder recorded in the securities register of Newco or by holding for pick-up by the Holder at the registered office of USF or at such other location as may be specified by USF by notice to the Holders of certificates representing shares of USF Common Stock (which shares shall be duly issued as fully-paid and non-assessable and shall be free and clear of any lien, claim or encumbrance (less any taxes arising by reason of the Purchase) and a cheque of USF payable at par at any branch of the bankers of USF in respect of the additional amount equivalent to the full amount of all declared and unpaid dividends comprising part of the total Liquidation Call Price (less any tax required to be deducted and withheld therefrom by USF). In the event USF has exercised the Liquidation Call Right as provided herein, then on and after the day before the Newco Liquidation Date, the Holder of a Retractable Share shall cease to be a holder of such Retractable Share and shall not be entitled to exercise any of the rights of a holder in respect thereof, other than the right to receive his proportionate part of the Liquidation Call Price, unless payment of the total Liquidation Call Price for such Retractable Share shall not be made upon presentation and surrender of share certificates in accordance with the foregoing provisions, in which case the rights of the Holders thereof shall remain unaffected until the Liquidation Call Price has been paid in the manner hereinbefore provided. USF shall have the right at any time after the sending of notice of its intention to exercise the Liquidation Call Right to deposit or cause to be deposited the Liquidation Call Price in respect of the Retractable Shares represented by certificates that have not at the date of such deposit been surrendered by the Holders thereof in connection with such Liquidation Call Right, in a custodial account with any chartered bank or trust company in Canada. Upon the later of such deposit being made and the Newco Liquidation Date, the Retractable Shares in respect whereof such deposit shall have been made shall be exchanged and the rights of the Holders thereof after such deposit or Newco Liquidation Date, as the case may be, shall be limited to receiving the proportionate part of the total Liquidation Call Price (less any taxes arising by reason of the purchase) for such Retractable Shares so deposited, against presentation and surrender of the said certificates held by them, respectively, in accordance with the foregoing provisions. Upon such payment or deposit of the Liquidation Call Price, the Holders shall thereafter be considered and deemed for all purposes to be holders of the shares of USF Common Stock delivered to them.

If any of the Holders' Retractable Shares are held by the Escrow Agent then USF will deliver to the Escrow Agent that part of the Liquidation Call Price represented by the shares so held and the Holders shall have no rights thereto except in accordance with the Escrow Agreement.

GRESCHNER 772

# ARTICLE 3

## EXERCISE OF THE RETRACTION CALL RIGHT

**3.1    Retraction.**  In the event that a Holder has exercised such Holder's retraction right (the "Retraction Right") under the Articles of Newco to require Newco to redeem any or all Exchangeable Shares (the "Retracted Shares"), USF shall have the overriding right (the "Retraction Call Right") to acquire all but not less than all of such Retractable Shares from such Holder in exchange, on a per share basis, for (a) the Specified Number of Shares of USF Common Stock on the last Business Day prior to the Retraction Date (as such term is defined in the Articles of Newco), which USF shall cause to be delivered to such Holder (less taxes arising by reason of such purchase) plus (b) the amount by which the declared and unpaid dividends on one Retractable Share exceeds, if at all, the declared and unpaid dividends on the Specified Number of Shares of USF Common Stock (calculated as of the date of the declaration of such dividend or dividends in accordance with the Articles of Newco) (less any tax required to be deducted or withheld therefrom by USF) (collectively, the "Retraction Call Price").

**3.2    Exercise of Retraction Call Right.**  To exercise the Retraction Call Right, USF must notify such Holders as are exercising their Retraction Right with respect to any or all of their Retractable Shares and Newco, of USF's intention to exercise such right within 5 Business Days after USF has been notified by Newco that a Holder is exercising such Holder's Retraction Right.  If USF exercises the Retraction Call Right, on the day before the Retraction Date USF[Sub] will purchase and the Holders will sell such Retractable Shares for a price per share equal to the Retraction Call Price.

**3.3    Procedure for Payment of Retraction Call Price.**  In the event USF has exercised the Retraction Call Right as provided herein, then the procedure set out in Section 2.3 will apply *mutatis mutandis.*

# ARTICLE 4

## EXERCISE OF THE DIVIDEND CALL RIGHT

**4.1    Dividends.**  In the event that USF has declared a dividend on its USF Common Shares so that a Holder of an Retractable Share is entitled to an equivalent dividend (the Dividend Right") under the Articles of Newco, USF shall have the overriding right (the Dividend Call Right") to acquire on the last business day prior to Dividend Payment Date (as such term is defined in the Articles of Newco) all but not less than all of the Retractable Shares from all Holders in exchange, on a per share basis, for (a) the Specified Number of Shares of USF Common Stock, which USF shall cause to be delivered to such Holder (less taxes arising by reason of such purchase) plus (b) the amount of the declared and unpaid dividends on the Specified Number of USF Common Stock (calculated as of the date of the declaration of such dividend or dividends in accordance with the Articles of Newco) (less any tax required to be deducted or withheld therefrom by USF) (collectively, the Dividend Call Price").

**4.2     Exercise of Dividend Call Right.**  To exercise the Dividend Call Right, USF must notify Holders of the Retractable Shares and Newco of USF's intention to exercise such right within 5 Business Days after the declaration of the dividend on the USF Common Shares.  If USF exercises the Dividend Call Right, on the Dividend Payment Date USF will purchase and the Holders will sell such Retractable Shares for a price per share equal to the Dividend Call Price.

**4.3     Procedure for Payment of Dividend Call Price.**  In the event USF has exercised the Dividend Call Right as provided herein, then the procedure set out in Section 2.3 shall apply *mutatis mutandis.*

## ARTICLE 5

## OVERRIDING EXERCISE OF THE CALL RIGHT

**5.1     Three Year Call.**  On or after October 1, 2000, USF shall have the overriding right (the "Three Year Call Right") to acquire on a Business Day (the "Call Date") all but not less than all of the Retractable Shares from all Holders in exchange, on a per share basis, for (a) the Specified Number of Shares of USF Common Stock which USF shall cause to be delivered to such Holder (less taxes arising by reason of such purchase) plus (b) the amount by which the declared and unpaid dividends on one Retractable Share exceeds, if at all, the declared and unpaid dividends on the Specified Number of Shares of USF Common Stock (calculated as of the date of the declaration of such dividend or dividends in accordance with the Articles of Newco) (less any tax required to be deducted or withheld therefrom by USF) (collectively, the "Three Year Call Price").

**5.2     Business Based Call Right.**  At any time prior to October 1, 2000, upon determination of the directors of USF that circumstances have arisen that make it desireable to acquire all the Retractable Shares, whether due to achange in legislation, market actions, such as a takeover bid, merger, liquidation, or any other factors which in the opinion of the directors of USF make such an acquisition desireable, USF shall have the same rights as it has under Section 5.1 as though the date of October 1, 2000 had arrived.  Such call right for business reasons, together with the Three Year Call Right is referred to as the Call Right.

**5.3     Exercise of Call Right.**  To exercise the Call Right, USF must notify the Holders of USF's intention to exercise such right within at least 5 Business Days prior to the Call Date.  If USF exercises the Call Right, on the Call Date USF will purchase and the Holders will sell such Exchangeable Shares for a price per share equal to the Call Price.

**5.4     Procedure for Payment of Call Price.**  In the event USF has exercised the Call Right as provided herein, then  the procedure set out in Section 2.3 shall apply *mutatis mutandis.*

# ARTICLE 6

# COVENANTS OF USF, NEWCO AND THE HOLDERS

**6.1    Right to Dividends.**  There shall be no payment or adjustment by USF, Newco or by a Holder on account of any dividends on any Retractable Shares on a Share Exchange in respect of such Retractable Shares occurring prior to the record date for such dividend.

**6.2    Stamp or Other Transfer Taxes.**  The Holders of Retractable Shares shall be solely responsible for the payment of any stamp, documentary or other like taxes or charges that may be payable by Newco or USF to any governmental body or agency in respect of the transfer to USF of Retractable Shares on the transfer or issuance of shares of USF Common Stock to any Holder pursuant to a Share Exchange and any Holder whose Exchangeable Shares are acquired by USF pursuant to a Share Exchange shall be solely responsible for the payment of any taxes that may be payable by the Holder in respect of the disposition to USF of such Retractable Shares.

**6.3    Fractional Shares.**  USF shall not be required to deliver fractional shares of USF Common Stock upon any Share Exchange as required in order to comply with this Agreement but shall instead pay the then market value of such fraction to the Holder, such market value to be conclusively determined by USF.

**6.4    Reservation of USF Shares.**  USF hereby represents, warrants and covenants that it has available, free from pre-emptive and other rights, out of its authorized and unissued capital stock such number of shares of USF Common Stock as is equal to the sum of the maximum number of shares of USF Common Stock which may be issuable from time to time to Holders upon a Share Exchange.

**6.5    Transfer Agent.**  USF covenants that it will supply its transfer agent, if any, with duly executed share certificates for the purpose of completing a Share Exchange.

**6.6    Non-Resident of Canada at Time of Exchange.**  Notwithstanding the provisions of any section of this agreement, in the event that a Holder does not represent and warrant that such Holder is not a non-resident of Canada within the meaning of the *Income Tax Act* (Canada) when USF is entitled to exercise any exchange right hereunder, such Holder shall provide to USF a certificate pursuant to section 116 of the *Income Tax Act* (Canada) or any successor provision thereto (such certificate being hereinafter referred to as a "Certificate") having a certificate limit which is not less than the fair market value of the USF Common Stock which such Holder is entitled to receive upon such exchange and otherwise conforming in all respects with the provisions of section 116 of the *Income Tax Act* (Canada) or any successor provisions thereto.  If such a Holder does not provide such Certificate to USF on or before the date on which the exchange is to occur, USF shall be entitled to hold back USF Common Stock having a fair market value equal to the amount of any taxes that USF would be required to pay on behalf of the Holder pursuant to Section 116 of the *Income Tax Act* (Canada) or any successor thereto.  USF shall be entitled to sell such USF Common Stock for and on behalf of the Holder and to remit the sale price to Revenue Canada on account of

GRESCHNER 775

any such taxes, both such sale and such remittance to take place at the latest time (determined by USF acting reasonably) as will enable it to comply with the requirements of subsection 116(5) of the *Income Tax Act* (Canada) or any successor thereto in the event that such Holder fails to provide such Certificate before such time. If the Holder provides such Certificate before such time, USF shall release to such Holder any USF Common Stock so held back or the proceeds from a sale thereof if not remitted to Revenue Canada.

## ARTICLE 7

## SUCCESSORS AND ASSIGNS

**7.1    USF and Newco.**  The provisions of this Agreement shall be binding upon, and inure to the benefit of, the respective transferees, successors, assigns, executors, administrators and legal representatives of USF and Newco and the Sellers and Holders, provided, however, that this Agreement may not be assigned by USF or Newco in whole or in part except as otherwise expressly provided herein and this Agreement may only be assigned by the Sellers or other Holders if section 7.3 of this Agreement is complied with.

**7.2    USF Successors.**  Subject to Section 5.2, USF shall not enter into any transaction (whether by way of reconstruction, reorganization, consolidation, merger, transfer, sale, lease or otherwise) whereby all or substantially all of its undertaking, property and assets would become the property of any other person or, in the case of a merger, of the continuing corporation resulting therefrom unless, but may do so if:

(a)    such other person or continuing corporation (herein called the "USF Successor"), by operation of law, becomes, without more, bound by the terms and provisions of this Agreement or, if not so bound, executes, prior to or contemporaneously with the consummation of such transaction an agreement supplemental hereto and such other instruments (if any) as are satisfactory to at least two thirds of the Holders of the Retractable Shares and in the opinion of a single legal counsel to such Holders are necessary or advisable to evidence the assumption by the USF Successor of liability for all moneys payable and property deliverable hereunder and the covenant of such USF Successor to pay and deliver or cause to be delivered the same and its agreement to observe and perform all the covenants and obligations of USF under this Agreement; and

(b)    such transaction shall, to the satisfaction of such Holders and in the opinion of such legal counsel, be upon such terms as substantially to preserve and not to impair in any material respect any of the rights, duties, powers and authorities of the Holders hereunder.

**7.3    Transfer by Holder.**  In addition to any other restrictions on transfer that may apply from time to time to the Retractable Shares pursuant to the Articles of Newco or otherwise, a

Holder may transfer all or a portion of such Holder's Retractable Shares only if each transferee agrees to hold such Retractable Shares subject to, and agrees to be bound by, this Agreement as if such transferee were the Holder and prior to such transfer, each such transferee executes and delivers such agreements as USF may reasonably require in order to confirm that each such transferee so holds such Retractable Shares and so agrees to be bound. No Retractable Share may be transferred without the express consent of USF.

## ARTICLE 8

## TERMINATION

**8.1    Term.**  This Agreement shall continue until no outstanding Retractable Shares are held by a Holder other than USF and its Subsidiaries.

## ARTICLE 9

## MISCELLANEOUS

**9.1    Amendments, Modifications, etc.**  This Agreement may not be amended, modified or supplemented by the parties hereto in any manner, except by an instrument in writing signed by duly authorized officers or representatives of USF and Newco and by all of the Holders.

**9.2    No Waiver.**  The failure of any party hereto to enforce at any time any of the provisions of this Agreement shall in no way be construed to be a waiver of any such provision, nor in any way to affect the validity of this Agreement or any party hereof or the right of such party thereafter to enforce each and every such provision. No waiver of any breach of or non-compliance with this Agreement shall be held to be a waiver of any other or subsequent breach or non-compliance.

**9.3    Governing Law.**  This Agreement shall be governed by and construed and enforced in accordance with the laws of Ontario.

**9.4    Notice.**  All notices and other communications hereunder shall be in writing and shall be deemed given if delivered by hand, sent by facsimile transmission with confirmation of receipt requested, sent via a reputable international courier service with confirmation of receipt requested, or mailed by registered or certified mail (postage prepaid and return receipt requested) to the parties at the following addresses (or at such other address for a party as shall be specified by like notice), and shall be deemed given on the date on which delivered by hand or otherwise on the date of receipt as confirmed:

TO:    USF or Newco, then to:

Michael Hulme

United States Filter Corporation
40 - 004 Cook Street
Palm Desert, California 92211
U.S.A.

TO:     Sellers, then to:

Don Fettes
c/o MacPherson Leslie & Tyerman
1500-1874 Scarth Street
Regina, Saskatchewan
S4P 4E9.

Attention: Robert Pletch

**9.5    Notice to Holders.**  Any and all notices to be given and any documents to be sent to any Holders may be given or sent to the address of such Holder shown on the register of Holders of Retractable Shares in any manner permitted by the by-laws of Newco from time to time in force in respect of notices to shareholders and shall be deemed to be received (if given or sent in such manner) at the time specified in such by-laws, the provisions of which by-laws shall apply *mutatis mutandis* to notices or documents as aforesaid sent to such holders.

**9.6    Construction of Agreement.**  A reference to an Article or Section shall mean an Article of or a Section in this Agreement unless otherwise expressly stated.  The titles and headings herein are for reference purposes only and shall not in any manner limit the construction of this Agreement which shall be considered as a whole.  The words "include," "includes" and "including" when used herein shall be deemed in each case to be followed by the words "without limitation."

**9.7    Entire Agreement, Assignability, etc.**  This Agreement together with other concurrent written documentation relating to the Retractable Shares (a) constitutes the entire agreement, and supersedes all other prior agreements and understandings, both written and oral between the parties with respect to the subject matter hereof, (b) is not intended to confer upon any person other than the parties hereto any rights or remedies hereunder, except as otherwise expressly provided herein, and (c) shall not be assignable by operation of law or otherwise, except as otherwise expressly provided herein.

**9.8    Validity.**  The invalidity or unenforceability of any provisions of this Agreement shall not affect the validity or enforceability of any other provisions of this Agreement, each of which shall remain in full force and effect.

**9.9    Currency.**  Except where otherwise expressly provided, all amounts in this Agreement are stated and shall be paid in Canadian currency.

**9.10    Counterparts.**  This Agreement may be executed in one or more counterparts, all of which together shall constitute one and the same Agreement.


          IN WITNESS WHEREOF, the parties have duly executed this Agreement as of the date first above written.


                              **UNITED STATES FILTER CORPORATION**


                              By:    _____
                              Name:
                              Title:


                              **[Newco]**



                              By:    _____
                              Name:
                              Title:


                              **Industria Capital Inc.**


                              By:    _____
                              Name:
                              Title:


                              **Ron Greschner Enterprises Ltd.**


                              By:    _____
                              Name:
                              Title:

GRESCHNER779

LJM\00052095\000010\20389081.01

GRESCHNER 780

## EXHIBIT 5

## ESCROW AGREEMENT

**THIS AGREEMENT** made as of the 30th day of September, 1997

AMONG:

**ARVA INVESTMENTS LIMITED**, an Ontario corporation
(herein after referred to as "**Arva**")

-and-

**INDUSTRIA CAPITAL INC.**, a Saskatchewan corporation
(hereinafter referred to as "**Industria**")

-and-

**RON GRESCHNER ENTERPRISES INC.**,  a Saskatchewan corporation
(hereinafter referred to as "**Greschner**")

-and-

**WILL SLOBODIAN**, an individual resident in Regina, Saskatchewan
(hereinafter referred to as "**Slobodian**")

-and-

**DWIGHT D. AURAMENKO** an individual resident in Regina, Saskatchewan
(hereinafter referred to as "**Auramenko**")

-and-

**NORM REISE**, an individual resident in Regina, Saskatchewan
(hereinafter referred to as "**Reise**")

(collectively the "**Sellers**")

-and-

**1258010 ONTARIO INC.**, a corporation incorporated pursuant to the laws of
Ontario
(hereinafter referred to as the "**Buyer**")

Doc R249178

-and-

**UNITED STATES FILTER CORPORATION**, a corporation incorporated pursuant to the laws of the State of Delaware
(hereinafter referred to as "**USF**")

-and-

**BLAKE, CASSELS & GRAYDON**, a partnership of barristers and solicitors having an office in the City of Toronto, Province of Ontario
(hereinafter referred to as the "**Escrow Agent**")

**WHEREAS:**

The Sellers, Buyer and USF are parties to the Share Purchase Agreement dated September 30, 1997 (the "Share Purchase Agreement").

Pursuant to section 7.6 of the Share Purchase Agreement, the Sellers agreed to deposit the Escrow Shares with the Escrow Agent to be held in escrow in accordance with the terms of this Agreement to provide the Buyer with security for any Buyer's Damages and Post Closing Price Adjustment as defined in the Share Purchase Agreement.

The Escrow Agent has agreed to hold the Escrow Shares subject to the terms and conditions of this Agreement.

**THIS AGREEMENT WITNESSES** that in consideration of the mutual covenants and agreements herein the sum of $10. and other good and valuable consideration (the receipt and sufficiency of which are hereby acknowledged), the parties hereto covenant and agree as follows:

1.    **Capitalized Terms.**  Capitalized terms used in this Agreement and not otherwise defined shall have the meanings given to such terms in the Share Purchase Agreement.

2.    **Appointment of Escrow Agent.**    The Sellers and the Buyer hereby appoint the Escrow Agent to act as the escrow agent in accordance with the terms and conditions of this Agreement, and the Escrow Agent hereby agrees to act in accordance with the terms and conditions of this Agreement.

3.    **Deposit of Escrow Shares.**  The Sellers hereby deliver or, in the case of Industria hereby agree to deliver to the Escrow Agent the following Share Certificates endorsed in blank (the "**Escrow Shares**") to be held on the terms and conditions of this Agreement and the Escrow Agent hereby acknowledges receipt of the Escrow Shares:

From Arva:
a share certificate representing 21,569 shares in the capital of USF

GRESCHNER782

From Industria:
a share certificate representing 15,109 shares in the capital of USF or a share certificate representing 15,109 Retractable Shares of Buyer, such certificate to be delivered on or before October 31, 1997

From Greschner:
a share certificate representing 5,604 shares in the capital of USF

From Slobodian:
a share certificate representing 1,882 shares in the capital of USF

From Auramenko:
share certificate representing 1,882 shares in the capital of USF

From Reise:
share certificate representing 1,882 shares in the capital of USF

4.    **Escrow Provisions.**  The Escrow Agent shall hold the Escrow Shares in escrow on the terms and conditions set forth in this Agreement.

5.    **Election of Sellers.**  At Closing, Arva elected to fund all indemnification payments to be made to the Buyer by it in cash.

6.    **No Transfer**.    The Escrow Shares shall not be sold, assigned, hypothecated, alienated, released from escrow, transferred within escrow or dealt with in any manner whatsoever except pursuant to the terms and conditions of this Agreement.

7.    **Disposition of Escrow Shares**.  Upon receipt by the Escrow Agent of a written direction signed by each of the Sellers and the Buyer, the Escrow Agent is hereby irrevocably authorized and directed to deliver the Escrow Shares, in accordance with such written direction.  The Escrow Agent shall have no obligation to make any determination as to the validity of any such direction or any claim made by any party for entitlement to the Escrow Shares and the Escrow Agent shall be entitled to continue to hold the Escrow Shares until such time as the Escrow Agent receives a written direction signed by both all the Sellers and Buyer as contemplated in this Section or until the Escrow Agent is directed by a final judgment of a Court as to disposition of the Escrow Shares.

8.    **Notice from the Sellers.**  If at any time the Sellers deliver to the Escrow Agent a certificate of an officer or director of each Seller that is a corporation, and a statutory declaration of each Seller that is an individual (collectively, the "Sellers' Release") (the day of such delivery being the "Delivery Date") stating that the Sellers are entitled to have the Escrow Shares, or some part of such Escrow Shares described in the Sellers' Release, delivered to them, then:

GRESCHNER 783

the Escrow Agent shall within 4 days after the Delivery Date deliver a copy of the Sellers' Release to the Buyer and to USF;

if the Escrow Agent has not, on or before the expiry of 30 days after the Delivery Date, received a certificate of an officer or director of the Buyer or USF (either one being a "Buyer's Dispute") disputing that the Sellers are entitled to have the Escrow Shares delivered to them and giving reasons therefor, then the Escrow Agent shall forthwith deliver the Escrow Shares to the Sellers; and

if the Escrow Agent has, on or before the expiry of 30 days after the Delivery Date, received a Buyer's Dispute, then the Escrow Agent shall forthwith upon receipt thereof deliver a copy of the Buyer's Dispute to each of the Sellers, and the Escrow Agent shall be entitled to and shall thereafter continue to hold the Escrow Shares in escrow until directed to deliver the Escrow Shares:

by a written direction executed by all the Sellers and the Buyer; or

as directed by final judgment of a Court;

whereupon the Escrow Agent shall be entitled to and shall deliver the Escrow Shares or part thereof as so directed.

9.    **Notice from the Buyer.**   If at any time the Buyer or USF delivers to the Escrow Agent a certificate of an officer or director of the Buyer a Buyer's Release (the day of such delivery being the "Delivery Date") stating that Buyer is entitled to have the Escrow Shares, or some part of such Escrow Shares described in the Buyer's Release, delivered to it, then:

the Escrow Agent shall within 4 days after the Delivery Date deliver a copy of the Buyer's Release to each of the Sellers;

if the Escrow Agent has not, on or before the expiry of 30 days after the Delivery Date, received a certificate of an officer or director of any Seller that is a corporation or a statutory declaration of any Seller that is an individual (a "Sellers' Dispute") disputing that the Buyer is entitled to have the Escrow Shares delivered to it and giving reasons therefor, then the Escrow Agent shall forthwith deliver the Escrow Shares to the Buyer; and

if the Escrow Agent has, on or before the expiry of 30 days after the Delivery Date, received a Sellers' Dispute, then the Escrow Agent shall forthwith upon receipt thereof deliver a copy of the Sellers' Dispute to the Buyer, and the Escrow Agent shall be entitled to and shall thereafter continue to hold the Escrow Shares in escrow until directed to deliver the Escrow Shares:

GRESCHNER 784

by a written direction executed by all the Sellers and the Buyer; or

as directed by final judgment of a Court;

Whereupon the Escrow Agent shall be entitled to and shall deliver the Escrow Shares or part thereof as so directed.

**10.    Termination.**  The escrow established hereby shall terminate on October 1, 1998, provided, however, that the escrow shall continue beyond such period to the extent that Buyer has given Sellers a notice of claim in accordance with Section 7.7 of the Share Purchase Agreement.  Subject to sections 8 and 9 and failing such notice of claim or to the extent not claimed in such notice of claim, the Escrow Agent shall deliver any shares still remaining in the escrow to the registered holders thereof.

**11.    Dispute.**  The Escrow Agent shall have the right at any time to deposit the Escrow Shares, with the accountant of the Ontario Court, General Division, in accordance with the rules of Civil Procedure respecting interpleader or in such other manner or on such other grounds as such Court may direct.  The Escrow Agent shall give written notice of any such deposit to the Sellers and Buyer and USF immediately after such deposit is made.

**12.    Rights of Escrow Agent.**   The Escrow Agent shall not be required to make any determination or decision with respect to the validity of any claim made by any Party or of any dispute thereof but shall be entitled to rely conclusively on the terms hereof and the documents tendered to it in accordance with the terms hereof.

**13.    No Agency.**  The parties acknowledge that the Escrow Agent is acting solely as a stakeholder at their request and for their convenience and the Escrow Agent shall not be deemed to be the agent of either the Sellers or Buyer in respect of the escrow herein referred to.  It is understood and agreed that the Escrow Agent is not acting as a trustee or in any fiduciary capacity, that the duties of the Escrow Agent hereunder are purely administrative in nature and the Escrow Agent shall not be liable to either the Sellers or Buyer for any error in judgment or for any act or omission on its part in respect of the escrow herein referred to unless such error in judgment, act or omission is made, taken or suffered in bad faith or involves gross negligence.

**14.    Indemnity.**  Each of the Sellers and USF hereby jointly and severally agree to indemnify and hold the Escrow Agent harmless from and against all costs, claims (including those from third parties) and expenses, including solicitor's fees and disbursements incurred in connection with or arising from the performance of the Escrow Agents' duties or rights hereunder; provided that this indemnity shall not extend to actions or omissions taken or suffered by the Escrow Agent in bad faith or involving gross negligence on the part of the Escrow Agent.

GRESCHNER785

15.    **Fees**.  Forthwith upon receipt of an invoice therefor the Sellers agree to pay one-half and USF agrees to pay one-half of the Escrow Agent's accounts for time, disbursements and applicable goods and services taxes relating to the performance by the Escrow Agent of its duties or rights hereunder or other work incidental to or contemplated pursuant to the terms of this Agreement.

16.    **Limitation on Duties**.  It is understood and agreed that the Escrow Agent's only duties and obligations in respect of the Escrow Shares are expressly set out in this Agreement.  The Escrow Agent shall have the right to consult with separate counsel of its own choosing (if it deems such consultation advisable) and shall not be liable for any action taken, suffered or omitted to be taken by it if the Escrow Agent acts in accordance with the advice of such counsel.  The Escrow Agent shall be protected if it acts upon any written communication, notice, certificate or other instrument or document believed by the Escrow Agent to be genuine and to be properly given or executed without the necessity of verifying the truth or accuracy of the same or the authority of the person giving or executing the same.

17.    **Resignation of the Escrow Agent**.  The Escrow Agent may, at any time, resign its obligations under this Agreement and be discharged from all further duties and liabilities hereunder by giving the Sellers and Buyer at least 10 days notice in writing of its intention to resign or such shorter notice as the Sellers and Buyer may accept as sufficient.  The Sellers and Buyer agree that they shall forthwith upon receipt of such notice appoint a new stakeholder to act in the place and stead of the Escrow Agent and if they fail to agree on such appointment, the Sellers and Buyer or the Escrow Agent may apply to a Judge of the Ontario Court, General Division on such notice as such Judge may direct for the appointment of a new stakeholder.  Upon any new appointment, the new stakeholder will be vested with the same powers, rights, duties and obligations as if it had been originally named herein as stakeholder and such new stakeholder shall enter into an agreement with the Sellers and Buyer agreeing to be bound by all of the provisions of this Agreement.

18.    **Discharge from Duties**.  Upon disposing of the Escrow Shares and in accordance with the provisions of this Agreement, the Escrow Agent shall be relieved and discharged from all claims and liabilities relating to the Escrow Shares and the Escrow Agent shall not be subject to any claims made by or on behalf of any party hereto.

19.    **No Conflict**.  The fact that the Escrow Agent is acting as stakeholder under this Agreement shall not in any way prevent it from representing the Buyer or USF in connection with the transactions contemplated in the Share Purchase Agreement or any litigation arising from the Share Purchase Agreement or this Agreement or from representing USF, the Buyer or any other party in any other capacity or in any other transaction.

20.    **Notice**.  All notices or other communications given pursuant to this Agreement shall be in writing and shall be either delivered by hand or by facsimile transmission addressed as follows:

6

GRESCHNER 786

in the case of **Arva**:

Arva Investments Limited
c/o John W. Stevens
Osler, Hoskin & Harcourt
Suite 3000
280 Park Avenue
New York, New York 10017

Facsimile:    (212) 867-5802

in the case of **Industria**:

Industria Capital Inc.
1024 Winnipeg Street
Regina, Saskatchewan
S4R 8P8

Facsimile:  (306) 721-6620
Attention:  Don Fettes

in the case of **Greschner**:

Ron Greschner Enterprises Inc.
c/o Ron Greschner
1024 Winnipeg Street
Regina, Saskatchewan
S4R 8P8

Facsimile:  (306) 721-6620

in the case of **Slobodian**:

Will Slobodian
58 Leslie Place
Regina, Saskatchewan
S4S 6R2

Facsimile:    (306) 721-6620

GRESCHNER 787

in the case of **Auramenko**:

Dwight G. Auramenko
11203 Wascana Meadows
Regina, Saskatchewan
S4V 2V5

Facsimile:     (306) 721-6620

in the case of **Reise**:

Norman Reise
4040 Gordon Road
Apartment 525
Regina, Saskatchewan
S4S 6W2

Facsimile:     (306) 721-6620

in the case of Buyer or USF

Michael E. Hulme, Jr., Esq.
United States Filter Corporation, Inc.
40-004 Cook Street
Palm Desert, California 92211
U.S.A.

Facsimile:     (760) 346-4024

in the case of the **Escrow Agent**, to:

Blake, Cassels & Graydon
Box 25 Commerce Court West
Toronto, Ontario
M5L 1A9

Facsimile:  (416) 863-2653
Attention:  Warren Grover

Any notice or other communication shall conclusively be deemed to have been given and received on the date on which it was delivered or sent if delivered or sent during normal business hours on a business day, and if delivered after normal business hours or on other than

GRESCHNER788

a business day, shall be deemed to have been given or sent on the next following business day. Any party may change its address for notices or other communications by giving notice thereof to the other parties to this Agreement in accordance with this Section.

21.    **Governing Law.**  This Agreement shall be construed and enforced in accordance with the laws of the Province of Ontario and the laws of Canada applicable therein.

22.    **Modification.**  This Agreement may only be modified or amended by an agreement in writing signed by all of the parties hereto.

23.    **Time.**  Time shall be of the essence of this Agreement.

24.    **Successors and Assigns.**  This Agreement shall enure to the benefit of and be binding upon the parties hereto and their respective heirs, executors, successors and assigns.

**IN WITNESS WHEREOF** the parties have executed this Agreement.

**Arva Investments Limited**

By:_____

Name:_____
Title:_____


**Industria Capital Inc.**

By:_____

Name:_____
Title:_____


**Ron Greschner Enterprises Inc.**

By:_____

Name:_____
Title:_____

9

GRESCHNER789

_____

**Will Slobodian**


_____

**Dwight G. Auramenko**


_____

**Norm Reise**


**1258010 Ontario Inc.**

By:_____

Name:_____
Title:_____


**United States Filter Corporation**

By:_____

Name:_____
Title:_____


**Blake, Cassels & Graydon**

By:_____

Name:_____
Title:_____


10518868 1

10

GRESCHNER 790

EXHIBIT 6

## AFFILIATE POOLING AGREEMENT

THIS AFFILIATE POOLING AGREEMENT dated as of the 30th day of September, 1997.

B E T W E E N:

UNITED STATES FILTER CORPORATION, a Delaware corporation ("USF"), and the undersigned stockholder, permitted assignee of any such stockholder, director or executive officer (the "**Signatory**") of WaterGroup Companies Inc. (the "**Company**").

Simultaneously with the execution and delivery of this Agreement, USF, 1258010 Ontario Inc., an Ontario corporation and indirect wholly-owned subsidiary of USF ("**Acquisition**"), and the Seller are consummating the transactions contemplated by a Share Purchase Agreement dated September 30, 1997 (the "**Share Purchase Agreement**"), providing for, among other things, the stockholders of the Company to receive shares of common stock of USF in exchange for shares of stock of the Company, in the manner provided in the Share Purchase Agreement. The Acquisition is intended to be accounted for as a pooling of interests pursuant to Opinion No. 16 of the Accounting Principles Board. All capitalized terms used but not defined herein shall have the meanings ascribed hereto in the Share Purchase Agreement.

NOW THEREFORE, in consideration of the mutual benefits to be derived from the Acquisition and of the mutual covenants contained in this Agreement, the parties agree as follows:

1.    **Transfer Restrictions**.

(a)    The Signatory may be deemed to be an "affiliate" of the Company within the meaning of Rule 145 promulgated under the Securities Act of 1933, as amended (the "Securities Act"), and Accounting Series Release No. 130, as amended ("Release No. 130"), Accounting Series Release No. 135 and Staff Accounting Bulletin No. 76 of the Securities and Exchange Commission (the "Commission"), although nothing contained herein shall be construed as an admission thereof

(b)    The Signatory has not sold, exchanged, transferred, pledged, disposed of or otherwise reduced his risk relative to any shares of Common Stock, $.01 par value, of USF (the "USF Shares"), or Common Stock, $_____ par value, of Common Stock (the "Company Shares") beneficially owned by the Signatory during the 30-day period prior to the Closing Date (as defined in the Share Purchase Agreement).

(c)    The Signatory shall not make any sale, transfer or other disposition in violation of the Securities Act or the rules and regulations promulgated thereunder without limiting, and in addition to, any other restrictions applicable to the sale of the USF Shares. Other than the transfer

GRESCHNER791

- 2 -

to Escrow contemplated by the Share Purchase Agreement, the Signatory shall not sell, exchange, transfer, pledge, dispose of or otherwise reduce his risk relative to any USF Shares until such time after the Effective Time as financial results covering at least 30 days of the combined operations of the Company and USF after the Closing Date have been published, within the meaning of Release No. 130, by USF in an effective registration statement, Annual Report on Form 10-K, Quarterly Report on Form 10-K or Current Report on Form 8-K filed with the Securities and Exchange Commission, or any publicly disclosed quarterly earnings report or press release or other authorized public disclosure by USF that includes the combined results of operations of USF and the Company. USF, at its discretion, may cause stop transfer orders to be placed with its transfer agent with respect to certificates for the USF Shares.

2. __Notices__. All notices and other communications pursuant to this Agreement shall be deemed to be sufficient if contained in a written instrument and shall be deemed given if delivered personally, telecopied, sent by nationally-recognized, overnight courier or mailed by registered or certified mail (return receipt requested), postage prepaid, to the parties at the following addresses (or at such other address for a party as shall be specified by like notice):

      (a)     if to USF, to:

          United States Filter Corporation
          40-004 Cook Street
          Palm Desert, California 92211
          Attention:     Chief Executive Officer
          Telecopier:     (760) 341-9368

          with a copy to:

          Michael E. Hulme, Jr., Esquire
          Assistant General Counsel
          United States Filter Corporation
          40-004 Cook Street
          Palm Desert, California 92211
          Telecopier:     (760) 341-9368

GRESCHNER 792

- 3 -

(b)    If to the Signatory, to:

_____

_____

_____

_____

_____

All such notices and other communications shall be deemed to have been received (a) in the case of personal delivery, on the date of such delivery, (b) in the case of a telecopy, when the party receiving such telecopy shall have confirmed receipt of the communication, (c) in the case of delivery by nationally-recognized, overnight courier, on the Business Day (as defined in the Share Purchase Agreement) following dispatch and (d) in the case of mailing, on the third Business Day following such mailing.

3.    **Counterparts**.  This Agreement may be executed in one or more counterparts, each of which shall be an original, but all of which together shall constitute one and the same meaning.

4.    **Entire Agreement**.  This Agreement, the Share Purchase Agreement, the Schedules and Exhibits thereto and any other document delivered in connection therewith contain the entire understanding of the parties hereto in respect of the subject matter hereof, and supersede all prior negotiations and understandings, oral or written, between the parties with respect to the subject matter hereof.

5.    **Attorney's Fees**.  In the event of any legal action or proceeding to enforce or interpret the provisions of this Agreement, the prevailing party shall be entitled to reasonable attorneys' fees, whether or not the proceeding results in a final judgment.

6.    **Successors and Assigns**.  This Agreement shall be enforceable by, and shall inure to the benefit of and be binding upon, the parties and their respective successors and assigns.  As used herein, the term "successors and assigns" shall mean, where the context so permit, heirs, executors, administrators, trustees and successor trustees and personal and other representatives.

7.    **Governing Law**.  This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware applicable to contracts made and to be performed therein.

8.    **Effect of Headings**.  The section headings herein are for convenience only and shall not affect the construction or interpretation of this Agreement.

9.    **Third Party Reliance**.  Counsel to and accountants for the parties shall be entitled to rely upon this Agreement.

10537559.2

GRESCHNER 793

- 4 -

10.     **Effectiveness of Agreement**.  This Agreement shall become effective at the Closing Date.
In the event that the Share Purchase Agreement shall be terminated, and the Share Purchase shall
be abandoned, in accordance with the Share Purchase Agreement, this Agreement shall
simultaneously therewith cease and terminate and be of no further force or effect and no party
hereunder shall have any rights or obligations of any nature whatsoever hereunder.

IN WITNESS WHEREOF, the parties hereto have caused this Affiliate Pooling
Agreement to be executed and delivered as of the date first above written.

**UNITED STATES FILTER CORPORATION**

By: _____
Name:
Title:

**[SIGNATORY]**

_____

By: _____
Name:
Title:

10537559.2

GRESCHNER 7 9 4